Laurence M. Rosen, Esq. (SBN 219683)
THE ROSEN LAW FIRM, P.A.
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

*Counsel for Plaintiff Xu*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| GUANGYI XU, Individually and on behalf of all others similarly situated,<br><br>       Plaintiff,<br><br>       v.<br><br>CHINACACHE INTERNATIONAL HOLDINGS LTD., SONG WANG, JING AN, and KEN VINCENT QINGSHI ZHANG,<br><br>       Defendants. | Case No: CV15-7952-CAS(RAOx)<br><br>**SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**<br><br>JURY TRIAL DEMANDED |

Lead Plaintiff Guangyi Xu ("Plaintiff"), by Plaintiff's undersigned attorneys, individually and on behalf of all other persons similarly situated, alleges the following based upon personal knowledge as to Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of Defendants' public documents, conference calls and announcements made by

- 1 -

Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding ChinaCache International Holdings Ltd. ("ChinaCache" or the "Company"), and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## **NATURE OF THE ACTION**

1.       This is a federal securities class action brought on behalf of a class consisting of all persons and entities, other than Defendants (defined below) and their affiliates, who purchased or otherwise acquired the securities of ChinaCache traded on the NASDAQ Stock Market ("NASDAQ") from March 27, 2015 to August 20, 2015, inclusive (the "Class Period"). Plaintiff seeks to pursue remedies against ChinaCache and certain of its officers and directors for violations of federal securities laws (the "Class").

2.       ChinaCache, a provider of content delivery network ("CDN") services, enables its clients to deliver content and applications over the Internet, enhancing the reliability and scalability of online services and applications, and improving the end-user experience.  The Company's service platform consists of its content delivery network, its servers and intelligent software.

3.       The CDN services market in which ChinaCache competes has been described by Defendants themselves as "intensely competitive and rapidly changing."

In addition to its domestic competitors such as ChinaNetCenter, Dnion Technology, and 21 Vianet, ChinaCache recently has begun to face competition from much larger domestic and multinational companies, such as Akamai Technologies, Tencent, Baidu, and Alibaba, which have entered the domestic market in China, offering CDN services to complement their existing Internet and other related services.  These recent entrants to the market have offered lower prices for their CDN services than ChinaCache in order to gain market share, driving down both the prices which the Company may charge and the profits which it earns.  Since many CDN providers have similar technological capacities, customers tend to place a premium on customer service when making purchasing decisions.  Accordingly, ChinaCache had strong, market-based incentives to stay ahead of its rivals by developing and then promoting its new technological advancements to attract new customers while swiftly and successfully implementing them in a manner that would not disrupt services for its existing customers.  Defendants knew that, in such a hyper-competitive market, any material setbacks along the way would jeopardize not only the Company's chances of expanding its market share, but its likelihood of maintaining strong loyalty among – and receiving strong revenues from – its existing customer base as well.

4.     In an effort to reduce costs and increase efficiency, in late 2014, Defendants disclosed to the market that the Company was developing and had begun implementing a "high performance cache cloud HPCC cloud distribution system [to]

substantially increase our potential efficiency, visibility and leverage broad scale." According to Defendants the development and implementation of the HPCC, in particular, cutting edge technology, would enable the Company "to improve speed and stability."

5.    In announcing the HPCC platform in November, 2014, Defendants boasted that they had completed the preliminary research and development for the HPCC platform, had launched it, and that it was making positive contributions to its financial performance in 2014.  They further stated that the "platform was able to support all kinds of CDN application and it is flexible to be deployed on top of any cloud infrastructure.  It can further increase system stability and reduce equipment cost."  The Company's development of and migration to the HPCC platform was critical to its success in both the near and long term.  The Company highlighted its development and implementation of the HPCC platform in its marketing and promotional materials to clients, and senior management had carefully monitored the progress of its development and implementation since at least late 2014.

6.    In February, 2015 Defendants announced the launch of the HPCC.  They boasted that "HPCC offers customers enhanced stability and utilization through a unified distribution platform that dispatches available bandwidth across all customer verticals."  Defendants touted that "[t]he result is better traffic load balance, higher bandwidth reuse rates, lower maintenance costs, and greater efficiency through

automated dispatching that maximizes bandwidth utilization, accelerates bandwidth allocation, and minimiz[ing] the potential for human error as compared with traditional CDN architectures."  These upgrades, Defendants stated, well-positioned ChinaCache "to address this significant market opportunity."  Defendants offered customers migrating to the HPCC additional value added security, storage and analytics services.

7.     On March 26 and March 27, 2015, a mere 4 to 5 days from the end of the first quarter of 2015, Defendants disclosed that the Company was on track to complete the migration to the HPCC platform by the end of the first quarter.  The Company, Defendants falsely claimed, was "on track in completing the migration in the first quarter of 2015, we can now offer enhanced services and a more efficient network to all our customers."  According to Defendant Zhang, the HPCC would be "fully functional" by March 31, 2014, and it showed improved network performance "by more than 60% compared to the previous platform, and is significantly better than the competition," making it "the foundation for ChinaCache's future business growth." According to Defendant An, "once we completed the migration, we expect the revenue growth momentum to return."  Thus, Defendants had led the market to believe that the migration to HPCC would be complete by March 31, 2014 and that with the migration, top-line growth would resume.

8.     Defendants, however, were far from completing migration to the HPCC platform by March 31, 2014.  In transitioning customers from the old platform to the

new, ChinaCache had encountered stability problems that forced the Company to operate both platforms simultaneously. Customers complained, and the Company's technical personnel became overwhelmed and were unable to resolve the technical issues for all of their customers. Internal strife, arising from the Company's appointment of Wang Jiang, ChinaCache's divisive Chief Technology Officer, to lead the HPCC implementation efforts, had caused a tidal wave of defections from the Company's technical staff. By the first quarter of 2015, with approximately 70% of its technical team gone, ChinaCache was unable to resolve all of its customers' needs for technical support.

9.      In response, senior management determined and implemented a plan to sacrifice the needs of many of its "Tier 2," or lesser-valued, customers in favor of its larger-valued, or "Tier 1," customers. Accordingly, when many Tier 2 customers sought technical support from ChinaCache, they were advised by the Company that would need to wait for future technical updates. "Dozens" of these "abandoned" Tier 2 customers were dissatisfied with the frequent technical problems and poor customer service they experienced and decided to switch their CDN provider from ChinaCache to one of the Company's rivals in the CDN market.

10.      In light of the highly competitive nature of the CDN industry in China, Defendants feared that disclosure of the technical problems resulting from its maintenance of the two platforms and of the loss of dozens of its Tier 2 customers

would cause the Company's reputation to suffer, and would prevent them from attracting new customers. Accordingly, Defendants determined not to disclose such developments in the hope that concealment would enable the Company to continue to lure new customers to its business with the promise of newer and improved technology, as well as retain its existing customer base.

11. During the Class Period, therefore, while ChinaCache was touting its completion of HPCC platform migration and the many benefits its customers would reap from its services on this new platform, Defendants failed to disclose that migration to the HPCC platform had not been completed. Indeed, for the approximately 70% of its customers who were not in Tier 1, technical problems plagued the very HPCC platform Defendants touted as more stable, more efficient and more cost-effective. As early as late 2014, the Company did not possess the technical resources to resolve all of these technical problems. As a result, "dozens" of customers were leaving ChinaCache for rival CDN service providers. Only on August 21, 2015, when Defendants were obligated to explain to analysts the reasons for the Company's enormous revenue shortfall, did ChinaCache disclose the technical and service issues which had pervaded its business since the beginning of the year.

12. Not only did Defendants fail to disclose the historical issues relating to the truth about the Company's implementation of HPCC, but they issued revenue guidance

which was rendered materially inaccurate when made in light of the issues surrounding the HPCC implementation.

13.     On August 21, 2015, not only did Defendants disclose that they had failed to complete the migration to the HPCC platform, but they disclosed that ChinaCache continued to run the old platform as well.  That is, Defendants told investors that they had shifted customers to the newer, more stable, more efficient, more cost-effective platform, but delivered the same platform that they developed the HPCC to better. Defendants stated, "The coexistence of old platform and HPCC creates operating and service issue, but specifically, the greatest challenge was to have two platforms running simultaneously to ensure sufficient bandwidth resources for our customers."  In addition, Defendants conceded that the Company had "encountered some challenge in HPCC stabilization process. We will continue to cautiously advance the migration process while sustaining the utmost service standards for our clients."  As a result, the Company missed Defendants' second quarter, 2015 revenue guidance as "lower-than-expected revenue growth was mainly due to the difficulties and issues we encountered during the migration of our HPCC platform ...."

14.     On this news, on relatively huge trading volume of 1,962,000 ADSs traded, the Company's shares fell $2.92 per ADS or over 34% from its previous closing price to close at $5.59 per share on August 21, 2015, damaging investors.

**JURISDICTION AND VENUE**

15.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. § 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

16.     This Court has jurisdiction over the subject matter of this action pursuant to § 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331.

17.     Venue is proper in this District pursuant to §27 of the Exchange Act, 15 U.S.C. §78aa and 28 U.S.C. §1391(b), as Defendants conduct business in this District, have an office in this District, and a significant portion of the Defendants' actions and the subsequent damages took place within this District.

18.     In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

**PARTIES**

19.     Plaintiff Guangyi Xu, as set forth in the attached Certification, acquired ChinaCache securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosure.

20.     Defendant ChinaCache is purportedly the leading total solutions provider of Internet content and application delivery services in the People's Republic of China

("China"). ChinaCache is headquartered in Beijing, China and maintains an office at 21700 Copley Drive Suite 300, Diamond Bar, California 91765. Its American Depository Shares ("ADS") trade on NASDAQ under the ticker symbol "CCIH."

21. Defendant Song Wang ("Wang") has served as the Company's Chief Executive Officer ("CEO") and Chairman throughout the Class Period.

22. Defendant Jing An ("An") has served as the Company's Chief Financial Officer ("CFO") throughout the Class Period.

23. Defendant Ken Vincent Qingshi Zhang ("Zhang") has served as the Company's President through the Class Period. On August 14, 2015, the Company announced that Zhang would no longer serve as the President upon the expiration of his term on August 31, 2015.

24. The defendants referenced above in ¶¶ 17 – 19 are sometimes referred to herein as the "Individual Defendants."

25. Defendant ChinaCache and the Individual Defendants are referred to herein, collectively, as the "Defendants."

## SUBSTANTIVE ALLEGATIONS

### *Background*

26. ChinaCache bills itself as "the leading total solutions provider of Internet content and application delivery services in China, accounting for 53% market share in terms of revenue in 2009, according to iResearch." The Company "provide[s] a

- 10 -

portfolio of services and solutions to businesses, government agencies and other enterprises to enhance the reliability and scalability of their online services and applications and improve end-user experience."[1]

27.    ChinaCache boasts of a China-wide "service platform which consists of our network, servers and intelligent software."  ChinaCache designed its service platform "to handle planned and unplanned peaks without significant upfront and ongoing capital outlay and other investments on the part of [its] customers."[2]

28.    ChinaCache tailors its "range of integrated solutions" to each of its customers' six major industries, including Media and Entertainment, Enterprises, E-commerce, Internet and Software Services, Mobile Internet, and Government Agencies.[3]  Tailoring each of its services to customers' needs as stand-alone or as part of its "integrated solutions package," ChinaCache designs solutions "help improve the performance and reliability of online services and applications."  It provides web page content services, file transfer services, rich media streaming services, guaranteed application services, managed Internet data services, ChinaCache cloud services,

---

[1] http://ir.chinacache.com/corpinfo.cfm.

[2] http://ir.chinacache.com/corpinfo.cfm.

[3] http://ir.chinacache.com/services.cfm.

content bridging services, value-added services, mobile internet solutions and cloud infrastructure development.[4]

29.     China's CDN industry has faced unprecedented competition in recent years.  In ChinaCache's Annual Report on Form 20-F for the period ending December 31, 2014, filed with the SEC on April 10, 2015 ("2014 20-F"), Defendants stated:

> We compete in a market that is intensely competitive and rapidly changing. We have experienced and expect to continue to experience intense competition. In China, we primarily compete with domestic content and application delivery service providers. Our primary domestic competitors include ChinaNetCenter, Dnion Technology, and 21Vianet which acquired FastWeb in 2012. In early 2014, Alibaba also announced the launch of AliCloud CDN commercial services to offer third-party CDN services. Although multinational companies currently do not have a significant presence in the content and application delivery services market in China, in part due to regulatory restrictions in China's telecommunications sector, we may face competition from multinational companies if regulatory restrictions in China are lifted in the future. Also, as a result of the growth of the content delivery services market, a number of companies are currently attempting to enter our market, either directly or indirectly, some of which may become significant competitors in the future. Some of our current or potential competitors may have greater financial, marketing and other resources than we do and may have stronger governmental support. Some of our competitors may offer lower prices on competing services in order to gain market share. Our competitors may be able to respond more quickly than we can to new or emerging technologies and changes in customer requirements. Furthermore, some of our current or potential competitors may bundle their offerings

---

[4] http://ir.chinacache.com/services.cfm.

Second Amended Class Action Complaint for Violation of the Federal Securities Laws

with other services, software or hardware in a manner that may discourage content providers from purchasing the services that we offer. Increased competition could result in price reductions and revenue decline, loss of customers and loss of market share, which could harm our business, financial condition and results of operations.[5]

30.     Major Internet operators in China, such as Tencent, Alibaba and Leshi, have established their own CDN platforms and have begun to provide CDN services to other Internet companies, which has created downward pressure on the prices which providers such as ChinaCache can charge for their services.  As a result, ChinaCache has faced competition not only from China Net Center and Dnion Technology, but also reduced orders from its own former major clients such as Tencent, Alibaba, and Baidu. In addition, Akamai, the world's largest CDN service supplier, is also planning to launch its own platform on the Chinese domestic market in cooperation with China Net Center.  Recently, ChinaCache was replaced by China Net Center as the largest CDN solution supplier in China with the largest market share.  Like its competitors, therefore, ChinaCache views as critical to its business the attraction of new customers and the retention of its existing ones.

31.     For example, in the 2014 20-F, Defendants stated:

In the 2014 20-F, for example, Defendants stated: "To increase our revenues, we plan to sell additional services to existing customers, encourage existing customers to increase their purchase volume and attract new customers. If our

---

[5] 2014 20-F at 11.

Second Amended Class Action Complaint for Violation of the Federal Securities Laws

existing and prospective customers do not perceive our services to be of sufficiently high value and quality, we may not be able to sell additional services to our current customers, retain our current customers or attract new customers. We typically sell our services pursuant to service agreements that are generally one year in duration. Although most of our service agreements contain renewal provisions, our customers have no obligation to renew the contracts after the expiration of their initial commitment period, and these service agreements may not be renewed at the same or higher level of service, if at all. Moreover, some of our service agreements provide that customers have the right to cancel their service agreements prior to the expiration of the terms of their agreements under certain circumstances. This, in addition to the changing competitive landscape in our market, means that we may not accurately predict future customer renewal rates. Our customers' renewal rates may decline or fluctuate as a result of a number of factors, including their level of satisfaction or dissatisfaction with our services, the prices of our services, the prices of services offered by our competitors and reductions in our customers' spending levels. In 2012, 2013 and 2014, 16.8%, 11.0% and 9.8%, respectively, of our total number of customers decided not to renew their contracts with us. If we cannot attract a sufficient number of new customers, control our existing customer attrition rate, or increase the purchase volume of our existing customers to cover the loss of existing customers, our revenues may decline and our business will suffer. In addition, we plan to attract additional customers for our cloud infrastructure and charge fees for facilities development and/or on-going management and operation. If we cannot attract enough customers for our cloud infrastructure project, we may not be able to recoup our investments and our profitability in connection with this business line will suffer adverse impact, which will in turn affect our overall results of operation.[6]

---

[6] 2014 20-F at 8.

Second Amended Class Action Complaint for Violation of the Federal Securities Laws

***ChinaCache Introduces the High Performance Cache Cloud ("HPCC")***

32.    As the Company described in the 2014 20-F, to capitalize on a "cloud computing trend" and reduce costs for its customers by affording them access to ChinaCache's services via the "cloud," the Company developed and "officially launched our next generation cloud-based CDN platform, HPCC.  HPCC offers our customers enhanced stability and utilization through a unified distribution platform that dispatches available bandwidth across all customer verticals." The Company continued that "the HPCC platform is expected to result in better traffic load balance, higher bandwidth reuse rates, lower maintenance costs, and greater efficiency through automated dispatching that maximizes bandwidth utilization, accelerates bandwidth allocation, and minimizes the potential for human error as compared with traditional CDN architectures."  The Company concluded that "[w]ith the development of our cloud infrastructure and cloud platform, we are well positioned to be the innovative cloud CDN leader in China.

33.    In a November 19, 2014 press release, Defendants announced the Company's third quarter 2014 results.  Defendant Wang stated that the Company had "sustained the excellent momentum established in the first half of 2014." Wang continued: "Our growth was again led by strong demand for our advanced mobile

- 15 -

technology and the continued adoption of CDN by leading enterprises."[7]   Wang concluded that, with efficient operations, superb service innovative solutions for customers, upgrades in network speed and capacity and enhanced analytics, "ChinaCache is at the forefront of content delivery technology and services, and we are positioned to efficiently handle the rapid growth in China's Internet traffic and deliver the finest performance for content providers and end-users."

34.    The next day, during the Company's November 20, 2014 earnings conference call with analysts, Defendants Wang continued to tout the Company's "powerful momentum" and its "achieving stable revenue and profit growth."  He spoke of "expanding our customer base, introducing new innovative services and making significant progress with our strategic partners."  Critically, in the context of these statements, Wang introduced a means of amplifying ChinaCache's powerful momentum.  He continued that in 2014 ChinaCache pursued "an important strategic objective . . . to improve our operations and the efficiency of our business."  During 2014, ChinaCache "invested significantly in R&D to build a new resource management system and a high performance cache cloud HPCC cloud distribution system."

35.    With respect to the HPCC system, Defendant Wang continued, ChinaCache "will substantially increase our potential efficiency, visibility and leverage

---

[7] "CDN" is a content delivery network, a system of distributed servers (network) that deliver webpages and other Web content to a user based on the geographic locations of the user, the origin of the webpage and a content delivery server.

Second Amended Class Action Complaint for Violation of the Federal Securities Laws

broad scale."   Noting the boom in broadband Internet traffic in China and the rapid "adoption of broadband internet by enterprises, traditional media, online video game providers, e-commerce and individual users," Wang discussed the "need for efficient cost and delivery."  In response to the market expansion, Wang continued, ChinaCache had taken several steps, including investing "in cutting edge technology to improve speed and stability, including . . . our high performance cloud cache platform."

36.   On that same November 20, 2014 earnings conference call, Defendant Zhang further touted the Company's HPCC platform, stating, "we have completed the preliminary R&D process for HPCC platform. This platform was able to support all kinds of CDN application and it is flexible to be deployed on top of any cloud infrastructure. It can further increase system stability and reduce equipment cost." Similarly, Defendant An focused his November 20, 2014 remarks on the HPCC platform, stating, "[i]n 2014, a significant objective of the Company was to enhance operational efficiency. . . ."  An continued that ChinaCache had "*launched* our high performance cloud caching platform recently. All of these initiatives *have been contributing* positively to our result of the profitability during the first nine months of this year."  (Emphasis added).

37.   Former ChinaCache employees confirmed the importance of the development and implementation of the HPCC platform.   According to Former

- 17 -

Employee 1 ("FE1"),[8] the development of the HPCC platform had a high level of importance to ChinaCache; it was one of the Company's most important projects. The Company, FE1 stated, created a specific department, staffing it with technical experts and focusing on HPCC research, development and implantation. FE1 stated, too, that in 2015, ChinaCache highlighted its implementation of the HPCC platform in selling its services. Former Employee 5 ("FE5")[9] confirmed that the implementation of the HPCC platform was very important to the Company and its 2015 sales. Indeed, according the FE5, the Company used its implementation of the HPCC platform and the expected higher stability, higher working efficiency and lower client costs in its promotions to customers.

38.    Former Employee 2 ("FE2")[10]  described that HPCC was a "core platform" for the next generation CDN that ChinaCache had been developing since 2014. Among HPCC's advantages, FE2 stated, were higher stability, higher availability, and significantly improved general operational management efficiency.

---

[8] FE1 was a project manager for ChinaCache from September, 2014 through January, 2016 in charge of resource management system development who participated in the HPCC migration project.

[9] FE5 served as a senior sales manager at ChinaCache from July, 2012 through October, 2015. FE5 was in charge of telecommunications and network equipment sales. In that role, her daily responsibilities included maintaining key clients, developing potential clients, and promoting ChinaCache IT solutions. FE5 reported directly to internet business department VP Wang Jing.

[10] FE2 served as a project manager for ChinaCache from September, 2009 through December, 2015. He was in charge of telecommunications operation projects, closely involved in CDNs for which ChinaCache developed its HPCC platform.

FE2 further stated that ChinaCache senior management attached a great deal of importance to the development and implementation of the HPCC platform and that the Company paid a great deal of attention to its development since the fourth quarter of 2014.

39.     According to Former Employee 12 ("FE12")[11] the HPCC platform was a core project of the Company in 2015.  ChinaCache invested great financial, talent and promotional resources into the HPCC project, confirming the importance of the project by reference to its making Chief Technology Officer ("CTO") Wang Jiang ("Jiang") personally responsible for the project.

40.     On December 18, 2014, the Company issued a press release announcing that its Board "ha[d] approved a share buyback program, under which the Company is authorized to repurchase, through open market purchases or privately negotiated transactions, up to US$10 million worth of outstanding American Depositary Shares of ChinaCache over the next 12 months . . . ."  The press release quoted Defendants Wang as expressing confidence in the long term growth of ChinaCache "as a leading CDN and Cloud total solutions provider in China. We believe that this share buyback

---

[11] FE12 was a human resource business partner ("HRBP") and operational department director of ChinaCache from August, 2014 through January, 2016, in charge of the Company's recruitment and operational fairs.  In his role as HRBP, FE12 was responsible for human resource management, including human resource cost control, personnel allocation, and recruitment.  In his role as operational department director, FE12 was involved in new product planning, operating, and promoting.  FE12 reported to both ChinaCache's HR VP, Luo Fan, and business department VP, Zhu Yan.

Second Amended Class Action Complaint for Violation of the Federal Securities Laws

program underscores our commitment to enhance value for our shareholders." According to the Company, it intended to fund the share buyback program, noting that "[a]s of September 30, 2014, the Company had cash and cash equivalents of approximately US$76.4 million."

41.    In a February 4, 2015 press release, the Company announced in its headline, "ChinaCache Launches Next Generation Cloud-Based CDN Platform; High Performance Cloud Cache Offers More Efficient Bandwidth Distribution." In the press release, the Company "officially announced the launch of the Company's next generation cloud-based CDN platform, High Performance Cloud Cache ("HPCC")." According to ChinaCache, "HPCC offers customers enhanced stability and utilization through a unified distribution platform that dispatches available bandwidth across all customer verticals."  Defendants touted that "[t]he result is better traffic load balance, higher bandwidth reuse rates, lower maintenance costs, and greater efficiency through automated dispatching that maximizes bandwidth utilization, accelerates bandwidth allocation, and minimizes the potential for human error as compared with traditional CDN architectures."

42.    The February 4, 2014 press release continued, quoting Defendant Wang as projecting that "[b]y 2018, 55% of all global Internet traffic will cross content delivery networks like ours, up from 36% in 2013, due in large part to the surging popularity of online video."  According to Defendant Wang, "[b]y upgrading our CDN

to a more efficient cloud-based platform, we are well positioned to address this significant market opportunity." Wang continued that "ChinaCache is well known for our innovative solutions that empower our customers in making their web experiences fast and reliable." Wang concluded that "[w]ith the implementation of HPCC, we continue to extend the value proposition to our customers via a new set of infrastructure capabilities in improving the overall user experiences."

43.    ChinaCache continued the February 4, 2015 press release "estimat[ing] that HPCC will allow approximately 30% reduction in capital expenditures as compared with the Company's traditional CDN platform. Additionally, ChinaCache customers migrating to HPCC will be offered additional value-added services in the areas of security, storage and analytics." Defendants concluded the February 4, 2015 press release by stating that "HPCC platform migrations are expected to be fully complete by the second quarter of 2015."

44.    In late March, 2015, as the first quarter of 2015 was drawing to a close, Defendants disclosed that the Company was on track to complete the migration to the HPCC platform by the end of the first quarter, which was then only days away. In a March 26, 2015 press release concerning the Company's results for the fourth quarter and fiscal year ended December 31, 2014, Defendant Wang stated that "[o]ur record revenue in 2014 reflects the strong capability, flexibility and reliability of our network

and content delivery technology in meeting the expanding demands of our diversified customers."

45.     In the March 26, 2015 press release, Defendant Wang discussed the impact of the Company's migration to the HPCC platform on its fourth quarter results. According to Defendant Wang, "Our fourth quarter revenue was impacted by our decision to accelerate customer migration onto our next-generation High Performance Cloud Cache ("HPCC") platform, which resulted in less available bandwidth and service capacity."   Smoothing the ramifications of the impact of the migration to the HPCC platform, Defendant Wang continued, the Company was "*on track in completing the migration in the first quarter of 2015, we can now offer enhanced services and a more efficient network to all our customers*.  This, Wang stated, "will strengthen our long-term competitive position and our ability to address a rapidly growing market.  Going forward, with our industry-leading infrastructure," Defendants Wang concluded, "customers will experience faster, more reliable service, and we will benefit from higher bandwidth reuse, and greater capacity through a more balanced network system."

46.     In the March 26, 2015 press release, the Company offered first quarter and 2015 guidance, projecting first quarter total net revenues between RMB340.0 million and RMB350.0 million and full year, 2015 total net revenue growth of 25%-30% over 2014 results.

47.    During the Company's March 27, 2015 earnings conference call with analysts, Defendants tied the Company's financial performance to the imminent completion of the migration to the HPCC platform.  According to Defendant Zhang, for example, the HPCC platform "is a major upgrade" of the Company's CDN platform that "can provide the network service with higher scalability, flexibility and stability." Defendants Zhang continued, that "HPCC will be the foundation for ChinaCache's future business growth."  ChinaCache, according to Defendant Zhang, expected the HPCC platform "to be fully functional by end of first quarter of this year."  Indeed, Zhang concluded his remarks about the HPCC migration, stating that in "ongoing tests" the implementation of the HPCC platform had improved network performance "by more than 60% compared to the previous platform, and is significantly better than the competition."

48.    On that same March 27, 2015 call, Defendant An explained the Company's fourth quarter, 2014, total net revenues shortfall from guidance, stating that "we made a strategic decision to accelerate the migration of customers to our high-performance cloud cache platform during the fourth quarter."  It was the migration to HPCC, Defendant An stated, that "required taking a portion of our network out of the service during the quarter, which considerably reduced our available bandwidth throughout the quarter more than we originally expected."  Defendant An further noted that "this migration will continue into the first quarter of 2015, we currently expect the

first quarter of 2015 revenue to be slightly above the first quarter of 2014. However, once we complete the migration, we expect the revenue growth momentum to return."

49.     Concluding his prepared remarks on the March 27, 2015 conference call, Defendant An offered guidance for the first quarter of 2015, ending March 31, 2015. "Based on current business projects which include the continued migration of customers to our high-performance cloud caching platform," An projected, "we expect our first quarter of 2015 revenue to be between RMB340 million and RMB350 million, representing 5% to 8% growth over the first quarter of last year."   Once again, Defendant An stated that "as the migration is completed and we return to advanced network infrastructure, we expect normal revenue growth throughout the remainder of the year."

50.     During the March 27, 2015 conference call, CICC analyst Liping Zhao asked about the impact on the Company's "top-line growth," of "the development of HCPP."  Zhao asked, "Should we expect the impact? Because in first quarter you have the guidance of 5% to 8% top-line growth, but should we expect a big leap from the second quarter or the third quarter?"  In response, Defendants Zhang stated, "I think as our platform HPCC will be fully functional in Q1 and most of our service will be crossed over during Q1 and Q2, and I think we'll see higher growth in -- we can expect higher growth in Q2 and Q3."

- 24 -

51.   On the trading day following these disclosures, in response to this overwhelmingly positive news, the price of ChinaCache ADSs rose sharply by more than 18%, from a March 26, 2015 close of $8.72 to a March 27, 2015 close of $10.30 on relatively large volume of 1,010,400 ADSs traded.

52.   Thus, just several days before the end of the first quarter, Defendants publically disclosed that the Company would complete the migration in the first quarter of 2015, and that investors would see the impact of that migration on top-line growth in the coming quarters.

### *ChinaCache Experiences Problems Migrating to the HPCC Platform*

53.   As of the end of the first quarter, ChinaCache had not completed the migration to the HPCC.  During an August 21, 2015 conference call, Defendants conceded this.  Defendants Wang stated, "As far as the high-performance cloud cache platform, or HPCC, we **continue to focus on migration during the second quarter**.  As of today, 90% of our pages have migrated to HPCC with improved stability."

54.   During the August 21, 2015 earnings call, Defendant Zhang said that "the coexistence of old platform and HPCC creates operating and service issue, but specifically, the greatest challenge was to have two platforms running simultaneously to ensure sufficient bandwidth resources for our customers."  Defendants Zhang continued that "[t]he HPCC itself is a new technology going through a breaking-in period and we are making constant improvement. Our team is also becoming more

familiar with HPCC platform and is accumulating the experience required to once again have ChinaCache set the industry standard."  Acknowledging that ChinaCache had failed to complete the migration process by the end of the first quarter, Defendant Zhang concluded that ChinaCache had "encountered some challenge in HPCC stabilization process. ***We will continue to cautiously advance the migration process*** while sustaining the utmost service standards for our clients" (emphasis added).

55.     Later in the August 21, 2015 conference call, Defendant An attributed the Company's revenue shortfall to the HPCC migration, stating, "[t]his lower-than-expected revenue growth was mainly due to the difficulties and issues we encountered during the migration of our HPCC platform that Mr. Wang and Ken have discussed."

56.     Former employees confirm not only that HPCC was a critical focus of the Company, but that information widely known among company insiders during the first quarter of 2015 belied the Company's positive, historical statements about the migration to the HPCC platform.  For example, according to Former Employee 4 ("FE4"),[12] ChinaCache experienced significant problems with its development and implementation of HPCC, failures which FE4 stated had related more to an internal

---

[12] FE4 served ChinaCache as a system architect from April, 2014 through September, 2015.  He was in charge of cloud service development.  FE4 did not work directly on the HPCC, but became aware of issues relating to HPCC development and implementation through his position at ChinaCache.  His main responsibilities included assisting new technology development VP Xu Huiquan with new products and technology research and development, attempting new product structure design and development, assisting ChinaCache North America R&D Center recruitment, undertaking technical consultancy jobs, and conducting ChinaCache internal training.

Second Amended Class Action Complaint for Violation of the Federal Securities Laws

Company political struggle than to technical fault.  FE4 confirmed that ChinaCache entrusted the development of the HPCC platform to CTO Jiang, someone whom FE4 understood to have little technical ability but caused upheaval.  Indeed, FE4 recalls that, when CTO Jiang began the HPCC project, he replaced the Company's then current technical team with his technical team from Goso, a prior employer of Jiang's.  According to FE4, this led approximately 70% of ChinaCache's technical personnel to resign in late 2014 and early 2015, just as the Company was implementing the HPCC migration.  This technical personnel drain, FE4 stated, negatively impacted the HPCC migration.

57.     FE4 stated that Jiang's new technical team did not have enough experience or capacity to cover a project of the size and scope of ChinaCache's HPCC migration.  Former Employee 13 ("FE13")[13] and Former Employee 14 ("FE14")[14] confirmed that, given the then-existing resources of Jiang's technical team, it was impossible for ChinaCache to complete the entire migration by the end of the first

---

[13] FE13 served as a source operation manager and senior project manager of ChinaCache from October 2013 to July 2016.  In those roles, he was responsible for the guidance of CDN node's broadband allowance dispatching, and node construction assessment. The source was also responsible for the management of over 20 projects, most of which related to mobile network operators.  FE13 reported to the director of the mobile network operator business unit.

[14] FE14 served as a data analyst at ChinaCache from April 2015 to May 2016.  In that role, she worked in the sales operation management department and was responsible for client contract management and income management, which included income forecast, recognition, and analysis.  FE14 directly served the internet business department and major accounts department, and reported directly to ChinaCache's internet business department vice-president, Wang Jing.

quarter of 2015. FE13 stated that, at that time, ChinaCache's market share exceeded 50%, which meant that, given ChinaCache's then-existing technical resources, completion of the platform migration for the entire network would have taken approximately one year. FE14 confirmed the accuracy of FE13's one-year estimate, stating that the migration process began late in the fourth quarter of 2014 and was not completed until the first quarter of 2016. FE14 and Former Employee 15 ("FE15")[15] stated that the "brain drain" which followed Jiang's appointment contributed to the delays in the platform migration.

58. Critically, former employees of the Company, including FE12 and FE8, also confirmed that clients began experiencing frequent technical problems during the first quarter of 2015, and that these failures resulted from the coexistence of the two platforms. FE12 stated that ChinaCache did not have sufficient technical personnel to serve all of its clients at the same time, while FE8 stated that such personnel lacked the requisite experience to address client concerns. According to FE12, some clients grew weary of the frequent technical failures caused by the dual platform and ChinaCache's inability to address their concerns in a timely manner. Lacking sufficient technical

---

[15] FE15 served as a regional sales manager at ChinaCache from January 2013 to January 2016. In that role, he was responsible for mobile network operators' sales including China Mobile, China Unicom, and China Telecom. Source N1 recalled that his main responsibility included working on CDN and cache product sales in the mobile network market, maintaining relationships with key clients in the network communication industry, cooperating with technical R&D department and completing sales orders, and providing technology solutions to his clients. FE15 reported directly reported to ChinaCache's mobile network operator business department vice-president, Wang.

resources to respond to all such concerns, ChinaCache's sales department and customer department advised clients that they would need to wait for further technical updates. When some clients objected, ChinaCache's sales and customer service staff actually assisted them in switching their platforms, either fully or partially, to the Company's rival CDN solution providers.

59.    As a result of these developments, according to FE12, during the first quarter of 2015, ChinaCache began to lose a material number of customers.  FE12 stated that the Company lost about 10% of its clients due to technical problems associated with HPCC platform migration.  ChinaCache's senior management not only knew about both these technical problems and the resulting loss of customers, but strategized on a regular basis to manage the fallout from these developments while keeping them hidden from investors.

60.    Since beginning its implementation of HPCC platform migration in late 2014, according to FE12, ChinaCache held monthly HPCC product quality conferences, which were attended by most senior managers and department managers. During these conferences, according to FE12, the customer service managers and sales managers updated management regarding the progress of the HPCC platform migration and provided reports regarding the maintenance of customer relationships.  In the interim, however, ChinaCache's sales and customer service staff had to make difficult determinations regarding their provision of services in light of the limited technical

resources which were then available to the Company's customers. Accordingly, members of the customer service department and sales department held weekly internal meetings to make recommendations regarding which customer relationships should be sacrificed or abandoned, which were often based on the relative business value of these customers. FE12 stated that the meeting results were reported to senior managers for final determinations. The customer service department and sales department then informed the "abandoned" customers of the decision and referred them to ChinaCache's competitors, such as China Net Center and Dnion.

61. According to FE12, ChinaCache abandoned "dozens" of its "Tier 2," or lesser-valued, customers to maintain the new platform as fully operational for its "Tier 1," or higher-valued, customers such as Apple, Inc., Tencent, and Microsoft. ChinaCache's Tier 1 customers have accounted for a disproportionate amount of the Company's revenues. According to Defendants, ChinaCache's "five largest customers contributed 22.6%, 32.6% and 31.5% of our total revenues for the years ended December 31, 2012, 2013 and 2014, respectively." 2014 20-F at 9. FE12 stated that when Tier 1 customers encountered technical problems during HPCC platform operation, due to the instability created by the coexistence of the two platforms, the Company was forced to deploy its entire, or nearly its entire, set of technical personnel to sort out the problem, address it, and maintain the stability of operations. By devoting all, or nearly all, of its technical resources to Tier 1 customers, however, ChinaCache

abandoned many of its Tier 2 customers, such as Toutiao.com and Vivo Mobile. During the first quarter of 2015, therefore, approximately 70% of the Company's customers had been identified by ChinaCache senior management as potential targets for abandonment.

62.    FE8 confirmed FE12's statement that ChinaCache's customers began experiencing technical problems due to the coexistence of the two platforms during the first quarter of 2015, and that customers complained to the Company regarding such problems.  FE14 confirmed that the abandoned Tier 2 customers accounted for 10-20% of the data managed by ChinaCache, and that the Company made a strategic decision to allocate its limited technical resources on its Tier 1 customers, such as Apple, Sina.com, and Taobao.com.  FE15 confirmed that the sales team held internal meetings almost every week to discuss which customers ChinaCache valued less and could release.  FE15 stated that the sales team transmitted these recommendations to senior managers for final determinations.

63.    According to FE4, ChinaCache's healthy revenues in the first quarter of 2015 resulted from customer interest in the HPCC that ChinaCache announced. ChinaCache, however, was unable to complete the HPCC migrations and, as a result, lost customers.  As of FE4's departure from ChinaCache in September, 2015, FE4 stated that ChinaCache had yet to complete the migration to the HPCC. According to FE5, the ChinaCache senior sales manager, the Company's migration to the HPCC

platform was incomplete and ChinaCache's customers were dissatisfied with the Company's performance, migrating to the HPCC platform.

64.    Many of the Company's personnel at all levels knew of the difficulties the Company experienced migrating to the HPCC platform.   For example, Former Employee 6 ("FE6")[16] stated that ChinaCache did not complete the migration to the HPCC by the end of the first quarter, 2015.   FE6 also stated that the Company's customers were unsatisfied with the migration progress because during the migrations, ChinaCache continued to use the old platform and the HPCC platform which caused instability and both technical and service problems.   FE2 confirmed that in migrating to the HPCC platform ChinaCache faced the challenge of managing the coexistence of old platform and new HPCC platform.   Former Employee 8 ("FE8")[17] concurs the migration to HPCC encountered technical problems in the first quarter of 2015, including the coexistence of the old platform and the HPCC, caused customer complaints, and that the Company attempted to react quickly to those complaints.

65.    Former Employee 11 ("FE11")[18] stated that in 2015, ChinaCache was involved in too many projects and did not have the financial or personnel resources to

---

[16] FE6 was an IT project manager for ChinaCache from June, 2014 through February, 2106.  He was in charge of CDN structure design and implementation.

[17] FE8 was vice manager of ChinaCache's operations department from February, 2015, through January, 2016, in charge of intra-business operational affairs.

[18] FE11 was the vice director of organizational development for ChinaCache from October, 2011 through November, 2015.  FE11 was responsible for new staff training and new project training.

- 32 -

support them all.  FE11 stated that while the personnel did not lack technical expertise, the Company had too few for the projects on which it was focused.  As a result, FE11 recalls, technical staff began suffering from "huge work depression," causing a large number to resign over the year before FE11 left the Company.  Former Employee 9 ("FE9")[19] who assisted with the HPCC migration stated that the technical problems which the HPCC migration encountered had resulted from a "shortage of technical experience," stating that the HPCC migration was ongoing upon FE9's departure from the Company.

66.    FE12 confirmed the existence of the migration problems in the first quarter of 2015, stating that ChinaCache had exaggerated publically its ability to launch the HPCC platform because the Company knew that its then current "technology power couldn't complete such an important project in one quarter."  FE12 stated that senior management "had to change the processing status to a breaking-in period in the second quarter of 2015."  By August, 2015, FE12 stated, ChinaCache had only completed 70-80% of the HPCC project.  Thus, by the beginning of the Class Period, defendants knew or were reckless in not knowing that: (i) ChinaCache had failed the migration to the HPCC platform was materially incomplete; (ii) it was operating on two platforms, causing material stability problems; (iii) customers had complained about the stability

---

[19] FE9 was a system engineer at ChinaCache from January, 2015 through November, 2015.

Second Amended Class Action Complaint for Violation of the Federal Securities Laws

issues and, in some instances defected; (iv) that important technical personnel were defecting from the Company; and (v) and that revenue would suffer as a result in the coming quarters.

## **MATERIALLY FALSE AND MISLEADING STATEMENTS**

67.     The Class Period begins with a March 26, 2015, 18:00 eastern time, press release, disclosing the Company's results for the fourth quarter and fiscal year ended December 31, 2014, Defendant Wang stated, "Our fourth quarter revenue was impacted by our decision to accelerate customer migration onto our next-generation High Performance Cloud Cache ("HPCC") platform, which resulted in less available bandwidth and service capacity."   Defendant Wang continued, the Company was "on track in completing the migration in the first quarter of 2015, we can now offer enhanced services and a more efficient network to all our customers." Defendant Wang concluded that "customers will experience faster, more reliable service, and we will benefit from higher bandwidth reuse, and greater capacity through a more balanced network system."

68.     On the Company's March 27, 2015 earnings conference call with analysts, Defendant Zhang stated that the HPCC platform "is a major upgrade" of the Company's CDN platform that "can provide the network service with higher scalability, flexibility and stability." Defendant Zhang continued that ChinaCache expected the HPCC platform "to be fully functional by end of first quarter of this year."

- 34 -

Zhang concluded his remarks about the HPCC migration, stating that in "ongoing tests" the implementation of the HPCC platform had improved network performance "by more than 60% compared to the previous platform, and is significantly better than the competition."

69.    On that same March 27, 2015 call, Defendant An explained the Company's fourth quarter, 2014, total net revenues shortfall from guidance, stating that "we made a strategic decision to accelerate the migration of customers to our high-performance cloud cache platform during the fourth quarter." It was the migration to HPCC, Defendant An stated, that "required taking a portion of our network out of the service during the quarter, which considerably reduced our available bandwidth throughout the quarter more than we originally expected." Defendant An further noted that "this migration will continue into the first quarter of 2015, we currently expect the first quarter of 2015 revenue to be slightly above the first quarter of 2014. However, once we completed the migration, we expect the revenue growth momentum to return."

70.    During the March 27, 2015 conference call, CICC analyst Liping Zhao asked about the impact on the Company's "top-line growth," of "the development of HCPP." Zhao asked, "Should we expect the impact? Because in first quarter you have the guidance of 5% to 8% top-line growth, but should we expect a big leap from the second quarter or the third quarter?" In response, Defendant Zhang stated, "I think as our platform HPCC will be fully functional in Q1 and most of our service will be

Second Amended Class Action Complaint for Violation of the Federal Securities Laws

crossed over during Q1 and Q2, and I think we'll see higher growth in -- we can expect higher growth in Q2 and Q3."

71.     The foregoing statements in the March 26, 2015 press release and the March 27, 2015 conference call were false and misleading.  At the time the foregoing statements were made – just 5 days prior to the close of the first quarter of 2015 – at least "dozens" of ChinaCache's Tier 2 customers were not experiencing a "faster, more reliable service," "enhanced services," a "more efficient network," a "more balanced network system," or "improved network performance" in connection with their CDN service.  Rather, during the first quarter of 2015, many of the Company's Tier 2 customers were experiencing instability in their service and other technical problems resulting from ChinaCache's maintenance of the two platforms.  ChinaCache's lack of sufficient technical personnel to address these concerns led to many dissatisfied Tier 2 customers, who were told that they would have to wait until the Company made technical updates, to leave, and, in fact, for ChinaCache to shepherd them to other providers.  Many of these "abandoned" customers switched their CDN provider from ChinaCache to one of the Company's rivals in the CDN market as a result of the frequent technical problems and poor customer service they experienced.  Defendants' failure to disclose these facts rendered false and misleading ChinaCache's claims to having provided a CDN  platform with a "faster, more reliable service," "enhanced services," a "more efficient network," a "more balanced network system," and

Second Amended Class Action Complaint for Violation of the Federal Securities Laws

"improved network performance" to its customers.  Defendants also knew or recklessly disregarded existing problems with the HPCC platform and trends that would negatively affect its business and financial results, including that: (i) the Company did not complete the platform migration to HPCC in the first quarter of 2015 and could not and would not complete the migration during the second quarter; (ii) the Company had been migrating to the HPCC platform since the fourth quarter of 2014 and knew, but failed to disclose, that technical issues forced it to use both the HPCC platform and the old platform simultaneously; (iii) the Company's use of the two platforms simultaneously caused stability problems that, in turn, caused customers to abandon ChinaCache even temporarily; and (iv) defections from the Company's technical staff rendered the Company unable timely to complete the migration to and fix the issues related to the migration to the HPCC platform.

72.    On April 10, 2015, the Company filed its 2014 20-F.  Defendant Wang signed the 2014 20-F.  SEC Regulation S-K, Item 303, 17 C.F.R. § 229.303, imposes certain disclosure requirements upon registrants in discussing their financial condition and results of operations in their annual or quarterly reports.  Among other things, Subsection (a) of Item 303, which pertains to annual reports, requires that registrants "describe any unusual or infrequent events or transactions or any significant economic changes that materially affected the amount of reported income from continuing operations and, in each case, indicate the extent to which income was so affected," and

"any known trends or uncertainties that have had or that the registrant reasonably expects will have a materially favorable or unfavorable impact on net sales or revenues or income from continuing operations." *Id.* § 229.303(a)(3)(i), (ii).

73.    The "Instructions to paragraph 303(a)" state that "[t]he discussion and analysis shall focus specifically on material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results or of future financial condition." 17 C.F.R. § 229.303(a), Instructions.  The Instructions further advise that "[t]his would include descriptions and amounts of (A) matters that would have an impact on future operations and have not had an impact in the past, and (B) matters that have had an impact on reported operations and are not expected to have an impact upon future operations." *Id.*

74.    The Company attached to the 2014 20-F the "Certification by the Principal Executive Officer Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002" of both Defendants Wang and An.  In those certifications, Defendants Wang and An stated:

> I have reviewed this annual report on Form 20-F of ChinaCache International Holdings, Ltd.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report.

75.    In the 2014 20-F, With respect to cloud infrastructure development, the Company stated:  "In early 2015, we officially launched our next generation cloud-

- 38 -

based CDN platform, HPCC. HPCC offers our customers enhanced stability and utilization through a unified distribution platform that dispatches available bandwidth across all customer verticals. The HPCC platform is expected to result in better traffic load balance, higher bandwidth reuse rates, lower maintenance costs, and greater efficiency through automated dispatching that maximizes bandwidth utilization, accelerates bandwidth allocation, and minimizes the potential for human error as compared with traditional CDN architectures."

76.    In addition, the Company stated the following risk factor with regards to HPCC:

> Our costs and expenses may increase, and our results of operations may be adversely affected if we cannot pass on the increased costs to our customers.
>
> We invest heavily in capital equipment and infrastructure to increase our network capacity. For example, we had capital expenditures of RMB88.7 million, RMB139.6 million and RMB259.3 million (US$41.8 million) in 2012, 2013 and 2014, respectively, which relate to our additions of land use right, intangible assets, and property and equipment. In 2015 and beyond, we expect to increase our costs and expenses, including investments in infrastructure and additional bandwidth, servers and other equipment. ***In particular, we launched and plan to continue the development of our Super-node Project, High Performance Cloud Cache, or HPCC, and Bandwidth Schedule Platform to optimize bandwidth usage and improve network efficiency. We expect these projects, upon completion, to result in substantial reduction in our future operation expenses and capital expenditures on equipment but because the aforementioned technologies are relatively new, we cannot assure you that their implementation will benefit us with the cost and expense reduction as expected, or at all.*** Furthermore, our capital expenditures are based upon our assumptions regarding the potential future demand. If we overestimate future demand for our services, we may

- 39 -

not be able to achieve acceptable rates of return on our capital expenditures and our results of operations may suffer dramatically. In addition, if our bandwidth and other third-party providers raise the prices of their services and products, we will incur increased costs in order to provide our services. If we cannot pass on the increased costs and expenses to our customers, or if our costs to deliver our services do not decline commensurate with any future declines in the prices we charge our customers, we may fail to achieve profitability.

(Emphasis added).

77.     The foregoing statements from the 2014 20-F were false and misleading. At the time the foregoing statements were made – 10 days after the close of the first quarter of 2015 – at least "dozens" of ChinaCache's Tier 2 clients were not experiencing "enhanced stability," "better traffic load balance," or "greater efficiency" in connection with their CDN service.  Rather, beginning in the first quarter of 2015, many of the Company's Tier 2 clients were experiencing instability in their service and other technical problems resulting from ChinaCache's maintenance of the two platforms.  ChinaCache's lack of sufficient technical personnel to address these concerns led to many dissatisfied Tier 2 customers, who were told that they would have to wait until the Company made technical updates, to leave.  Many of these "abandoned" clients switched their CDN provider from ChinaCache to one of the Company's rivals in the CDN market as a result of the frequent technical problems and poor customer service they experienced.  Defendants' failure to disclose these facts rendered false and misleading ChinaCache's claims to having provided a CDN service with "enhanced stability," "better traffic load balance," and "greater efficiency" to its

- 40 -

customers.  Defendants also knew or recklessly disregarded existing problems with the HPCC platform and trends that would negatively affect its business and financial results, including that: (i) the Company did not complete the platform migration to HPCC in the first quarter of 2015, and could not and would not complete the migration during the second quarter; (ii) the Company had been migrating to the HPCC platform since the fourth quarter of 2014 and knew, but failed to disclose, that technical issues forced it to use both the HPCC platform and the old platform simultaneously; (iii) the Company's use of the two platforms simultaneously caused stability problems that, in turn, caused customers to abandon ChinaCache even temporarily; and (iv) defections from the Company's technical staff rendered the Company unable timely to complete the migration to and fix the issues related to the migration to the HPCC platform.

78.  On May 18, 2015, the Company issued a press release announcing its first quarter 2015 financial results and guidance for the second quarter of 2015. With respect to HPCC, the Company reported that "a successful first quarter, generating double-digit revenue growth, which exceeded the upper end of our guidance range," according to Mr. Song Wang, Founder, Chairman and Chief Executive Officer of ChinaCache. "As we completed the migration to our High Performance Cloud Cache Platform and continue to invest to improve our infrastructure capabilities, we are experiencing enhanced customer satisfaction and increased new customer engagements, including CreditEase and Taikang Life.  Customers are pleased with the introduction of our

- 41 -

MPlus mobile intelligence aware solution, and our SMS (Smart Media Server) live streaming platform." He continued: "We are excited about our strong start to 2015, and we will continue focusing on meeting customer demands, while improving operation efficiency and achieving strong financial results through margin expansion and expense discipline."

79. The press release further disclosed the Company's revenue guidance for the second quarter of 2015, stating that "ChinaCache currently expects to generate total net revenues in the range of RMB392.0 million to RMB403.0 million for the second quarter of 2015, representing an increase of 7.8% to 10.8% over the first quarter of 2015." The Company continued that, "this forecast reflects ChinaCache's current view, which is subject to change."

80. On that same day, the Company held an earnings conference call for the first quarter of 2015. During the call, with regard to the migration to the HPCC, Defendant Wang stated that "[o]ur High Performance Cloud Cache, HPCC for short, platform migration has been completed on schedule." He concluded that "[d]uring the first quarter, the platform demonstrated a significant improvement in efficiency, leading the industry on all performance indicators. HPCC is the first of cloud-based CDN platform in the industry."

81. During the same May 18, 2015 conference call, Defendant Zhang touted the Company's "successful migration of cloud-based HPCC platform." As a result of

- 42 -

the migration and other technical upgrades, Zhang concluded that "we can provide to our clients with a more efficient and a stable network.  By end of Q1 over 90% of traffic is supported by HPCC platform now."  Similarly, during the May 18, 2015 conference call, Defendant An stated that "[t]he completion of our customer migration onto the High Performance Cloud Cache Platform was better than we expected."

82.    The foregoing statements in the May 18, 2015 press release and conference call were false and misleading.  At the time the foregoing statements were made – more than one month and a half after the close of the first quarter of 2015 – at least "dozens" of ChinaCache's Tier 2 clients were not experiencing "enhanced customer satisfaction and increased new customer engagements," a "significant improvement in efficiency," or a "more efficient and stable network" in connection with their CDN service.  Rather, beginning in the first quarter of 2015, many of the Company's Tier 2 clients were experiencing instability in their service and other technical problems resulting from ChinaCache's maintenance of the two platforms.  ChinaCache's lack of sufficient technical personnel to address these concerns led to many dissatisfied Tier 2 customers, who were told that they would have to wait until the Company made technical updates, to leave.  Many of these "abandoned" clients switched their CDN provider from ChinaCache to one of the Company's rivals in the CDN market as a result of the frequent technical problems and poor customer service they experienced.  Defendants' failure to disclose these facts rendered false and

- 43 -

misleading ChinaCache's claims to having provided "enhanced customer satisfaction and increased new customer engagements," a "significant improvement in efficiency," and a "more efficient and stable network" for its customers.  Defendants also knew or recklessly disregarded existing problems with the HPCC platform and trends that would negatively affect the Company's business and financial results, including that: (i) the Company did not complete the platform migration to HPCC in the first quarter of 2015 and could not and would not complete the migration during the second quarter; (ii) the Company had been migrating to the HPCC platform since the fourth quarter of 2014 and knew, but failed to disclose, that technical issues forced it to use both the HPCC platform and the old platform simultaneously; (iii) the Company's use of the two platforms simultaneously caused stability problems that, in turn, caused customers to abandon ChinaCache even temporarily; and (iv) defections from the Company's technical staff rendered the Company unable timely to complete the migration to and fix the issues related to the migration to the HPCC platform.

## **THE TRUTH EMERGES**

83.    At 18:00 eastern standard time on August 20, 2015, after the close of trading that day, the Company issued a press release announcing its financial results for the second quarter of 2015, ended June 30, 2015. The Company reported net revenues for the second quarter of 2015 of RMB353 million revenues, well below its May 18, 2015 guidance of RMB392 million to RMB403.  About these disappointing

- 44 -

results, Defendant Wang stated, "[a]s our CDN business becomes bigger and continues to grow, we must continue to improve our infrastructure and services to support this growth. Although we are currently experiencing some platform issues, which have impacted our top-line recently," Wang continued, "we are confident that our continued strategic investment in delivering innovative solutions will provide a differentiated value proposition to our customers, ensure the highest services standards and bandwidth optimization, and enable us to maintain our leadership position as the premium CDN total solution provider in China."

84.     On that same day, the Company held its second quarter 2015 earnings conference call. During the call, Defendant Zhang provided further information on the platform issues that caused the Company's net revenues to deteriorate.  About the Company's HPCC platform, Defendant Zhang stated, "the coexistence of old platform and HPCC creates operating and service issue, specifically the greatest challenge was to have two platforms running simultaneously to ensure sufficient bandwidth resources for our customers."   Defendants Zhang continued that the HPCC itself is "a new technology going through a breaking-in period and we are making constant improvement. Our team is also becoming more familiar with HPCC platform and is accumulating the experience required to once again have ChinaCache set the industry standard."

85.    On this news, on August 21, 2014, on relatively huge trading volume of 1,962,000 ADSs traded, the Company's ADSs fell $2.92 per ADS or over 34% from its previous closing price of $8.51 to close at $5.59 per share, damaging investors.

86.    In August, 2015, Defendant Zhang left the Company as did CTO Jiang, who had spearheaded the HPCC development and migration project.

87.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

**PLAINTIFF'S CLASS ACTION ALLEGATIONS**

88.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired ChinaCache securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosure. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

89.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, ChinaCache securities were actively traded on the NASDAQ. While the exact number of Class members is unknown to

- 46 -

Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by ChinaCache or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

90.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

91.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

92.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of ChinaCache;

Second Amended Class Action Complaint for Violation of the Federal Securities Laws

- whether the Individual Defendants caused ChinaCache to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of ChinaCache securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

93.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

94.    Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

Second Amended Class Action Complaint for Violation of the Federal Securities Laws

- ChinaCache securities are traded in an efficient market;

  o the Company's American Depository Shares ("ADS"), each representing 16 ordinary shares, were liquid and traded with moderate to heavy volume during the Class Period;

  o the Company traded on the NASDAQ Global Select Market;

  o As a regulated issuer, ChinaCache filed periodic public reports with the SEC;

  o During the Class Period, the average daily trading volume in ChinaCache's ADSs was approximately 299,139 ADSs. As such, weekly average trading volume was approximately 1.496 million ADSs. As such, substantial portion of the outstanding ADSs traded weekly, establishing a strong presumption that the market for its stock was efficient.

  o At least three analysts covered the Company, including Rosenblatt Securities, CICC and EVA Dimensions;

  o the Company's ADS price rapidly reflected new, company-specific information; and

  o During the Class Period, as many as twenty-nine (29) market makers made a market in the Company's stock.

Second Amended Class Action Complaint for Violation of the Federal Securities Laws

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased, acquired and/or sold ChinaCache securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

95.     Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

96.     Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## <u>NO SAFE HARBOR</u>

97.     ChinaCache's "Safe Harbor" warnings accompanying its reportedly forward looking statements ("FLS") issued during the Class Period were ineffective to shield those statements from liability. To the extent that projected revenues and earnings were included in the Company's financial reports prepared in accordance with

GAAP, they are excluded from the protection of the statutory Safe Harbor. *See* 15 U.S.C. §78u-5(b)(2)(A).

98.     Defendants are also liable for any false or misleading FLS pleaded because, at the time each FLS was made, the speaker knew the FLS was false or misleading and the FLS was authorized and/or approved by an executive officer of ChinaCache who knew that the FLS was false. None of the historic or present tense statements made by Defendants were assumptions underlying or relating to any plan, projection or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by Defendants expressly related to or stated to be dependent on those historic or present tense statements when made.

## CAUSES OF ACTION

## COUNT I

### Violations of Section 10(b) of the Exchange Act and Rule 10b-5
### against All Defendants

99.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

- 51 -

100.   This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

101.   During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of ChinaCache securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire ChinaCache securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

102.   Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the annual reports, SEC filings, press releases and other statements and

documents described above, including statements made to securities analysts and the media that were designed to influence the market for ChinaCache securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about ChinaCache's disclosure controls and procedures.

103.   By virtue of their positions at ChinaCache, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

104.   Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As the senior managers and/or directors of ChinaCache, the Individual Defendants had knowledge of the details of ChinaCache's internal affairs.

105.   The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of ChinaCache. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to ChinaCache's businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of ChinaCache securities was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning ChinaCache's business and financial condition which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired ChinaCache securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

106.   During the Class Period, ChinaCache securities were traded on an active and efficient market. Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired the ADSs of ChinaCache securities at prices

Second Amended Class Action Complaint for Violation of the Federal Securities Laws

artificially inflated by Defendants' wrongful conduct. Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of ChinaCache securities was substantially lower than the prices paid by Plaintiff and the other members of the Class. The market price of ChinaCache securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

107.   By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

108.   As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

### Violations of Section 20(a) of the Exchange Act
### against the Individual Defendants

109.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

110.    During the Class Period, the Individual Defendants participated in the operation and management of ChinaCache, and conducted and participated, directly and indirectly, in the conduct of ChinaCache's business affairs. Because of their senior positions, they knew the adverse non-public information about ChinaCache's operations, current financial position and future business prospects.

111.    As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to ChinaCache's business practices, and to correct promptly any public statements issued by ChinaCache which had become materially false or misleading.

112.    Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which ChinaCache disseminated in the marketplace during the Class Period concerning the Company's disclosure controls and procedures. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause ChinaCache to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of ChinaCache within

the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of ChinaCache securities.

113.   Each of the Individual Defendants, therefore, acted as a controlling person of ChinaCache. By reason of their senior management positions and/or being directors of ChinaCache, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, ChinaCache to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of ChinaCache and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

114.   By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by ChinaCache.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

A.     Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.    Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.    Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as her reasonable attorneys' fees, expert fees and other costs; and

D.    Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated: September 14, 2016                Respectfully submitted,

**THE ROSEN LAW FIRM, P.A.**

/s/ *Laurence M. Rosen*
Laurence M. Rosen, Esq. (SBN 219683)
355 S. Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

and

Jacob A. Goldberg
101 Greenwood Avenue, Suite 440
Jenkintown, PA 19046
Telephone: (215) 600-2817
Facsimile: (212) 202-3827
Email: jgoldberg@rosenlegal.com

***Counsel for Lead Plaintiff and the Class***

- 58 -

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## CERTIFICATE OF SERVICE

I hereby certify that on September 14, 2016, I electronically filed the foregoing *Second Amended Class Action Complaint for Violation of the Federal Securities Laws* with the Clerk of Court using the CM/ECF system, which will send notification of such to all CM/ECF participants.

**THE ROSEN LAW FIRM, P.A.**

By: */s/ Jacob A. Goldberg*
Jacob A. Goldberg
101 Greenwood Avenue, Suite 440
Jenkintown, PA  19046
Telephone: (215) 600-2817
Facsimile: (212) 202-3827
E-M: jgoldberg@rosenlegal.com

*Lead Counsel for Plaintiffs and the Class*

Second Amended Class Action Complaint for Violation of the Federal Securities Laws