UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

"O"

### CIVIL MINUTES - GENERAL

| Case No. | CV15-07952-CAS (RAOx) | Date | January 9, 2017 |
|---|---|---|---|
| Title | *GUANGYI XU v. CHINACACHE INTERNATIONAL HOLDINGS LTD., ET AL.* | | |

| Present: The Honorable | CHRISTINA A. SNYDER | |
|---|---|---|
| Ingrid Valdes | Laura Elias | N/A |
| Deputy Clerk | Court Reporter / Recorder | Tape No. |

| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
|---|---|
| Jacob Goldberg | Peter Morrison |
| | Matthew Tako |

**Proceedings:**      CHINACACHE'S MOTION TO DISMISS (Filed October 14, 2016, Dkt. 46)

## I.      INTRODUCTION

On October 9, 2015, plaintiff Guangyi Xu filed a class action complaint against ChinaCache International Holdings Ltd. ("ChinaCache" or "the company"); Song Wang, ChinaCache's Chief Executive Officer; Jing An, ChinaCache's Chief Financial Officer; and Ken Vincent Qingshi Zhang, ChinaCache's President through August 31, 2015 (collectively "defendants").[1]  Dkt. 1.

On February 19, 2016, plaintiff filed a First Amended Complaint.  Dkt. 27.  On April 4, 2016, ChinaCache filed a motion to dismiss the First Amended Complaint, dkt. 32, which the Court granted on August 15, 2016, dkt. 40.

On September 14, 2016, plaintiff filed the operative Second Amended Complaint ("SAC").  Dkt. 43.  The SAC alleges one claim against ChinaCache for violation of section 10(b) of the Securities Exchange Act of 1934 ("the Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17 CFR § 240.10b-5.  The gravamen of

---

[1] Only ChinaCache has been served with the complaint.  Dkt. 26.  The individual defendants have not joined in this motion to dismiss.  Any reference herein to "defendant" is meant to refer only to the moving party, ChinaCache.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

"O"

### CIVIL MINUTES - GENERAL

| Case No. | CV15-07952-CAS (RAOx) | Date | January 9, 2017 |
|---|---|---|---|
| Title | *GUANGYI XU v. CHINACACHE INTERNATIONAL HOLDINGS LTD., ET AL.* | | |

plaintiff's claim against ChinaCache is that the company made false statements regarding its transition to a new high performance cache cloud ("HPCC") distribution system. Plaintiff alleges that ChinaCache failed to disclose that the transition to the HPCC was fraught with technical issues, incomplete during the class-period, and resulted in worse service to ChinaCache's customers.

On October 14, 2016, ChinaCache filed a motion to dismiss the SAC. Dkt. 46. On November 15, 2016, plaintiff filed an opposition. Dkt. 49. On December 6, 2016, plaintiff filed a reply. Dkt. 52.

Having carefully considered the parties' arguments, the Court rules as follows.

## II.   BACKGROUND

Unless otherwise noted, the following background is based upon the allegations in the SAC.

ChinaCache is a provider of internet content and content delivery services in the People's Republic of China ("China") that offers an array of services including: web page services, file transfers, video streaming, mobile internet services, and cloud infrastructure development. SAC ¶¶ 20, 28. On November 20, 2014, Wang announced that the company had invested substantially in development of an HPCC distribution system and that the new HPCC system promised to increase efficiency, stability, and speed. Id. ¶¶ 34-35. Plaintiff alleges, based on information from former employees, that the development of the HPCC platform became one of ChinaCache's most important projects, id. ¶ 37, to which management attached a great deal of importance, id. ¶ 38.

Plaintiff alleges that in 2014 and 2015, ChinaCache faced "unprecedented competition." Id. ¶ 29. In ChinaCache's Annual Report on Form 20-F for the period ending December 31, 2014 ("2014 Form 20-F"), ChinaCache stated, "[w]e have experienced and expect to continue to experience intense competition." Id. ChinaCache's 2014 Form 20-F went on to explain that between 9.8% and 16.8% of customers had chosen not to renew their service contracts with ChinaCache in 2012, 2013, and 2014. Id. ¶ 31. The 2014 Form 20-F stated, "[i]f we cannot attract a sufficient number of new customers, control our existing customer attrition rate, or increase the

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

"O"

### CIVIL MINUTES - GENERAL

| Case No. | CV15-07952-CAS (RAOx) | Date | January 9, 2017 |
|---|---|---|---|
| Title | *GUANGYI XU v. CHINACACHE INTERNATIONAL HOLDINGS LTD., ET AL.* | | |

purchase volume of our existing customers to cover the loss of existing customers, our revenues may decline and our business will suffer." Id.

Plaintiff alleges myriad false and misleading statements in relation to the company's transition to the HPCC, beginning on March 26, 2015.

### A.    Allegedly False and Misleading Statements on March 26, 2015

On March 26, 2015, Wang issued a press release ("March press release"). In pertinent part, the press release claimed:

[A]s we are on track in completing the migration in the first quarter of 2015, we can now offer enhanced services and a more efficient network to all our customers.

Dkt. 33 Ex. 3 at 1.

On March 26, 2015, the company held an earnings conference call ("March conference call"), in which executives stated the following: [2]

(1) Zhang stated that he "expected" the HPCC platform would be "fully functional" by the end of the first quarter of 2015 and that in "ongoing tests" the HPCC implementation had improved performance by "more than 60% compared to the previous platform." FAC ¶ 47.

(2) Zhang further stated, "I think our platform HPCC will be fully functional in Q1 and most of our service will be crossed over during Q1 and Q2." Id. ¶ 50.

(3) An stated that the migration onto the HPCC would "continue into the first quarter of 2015." Id. ¶ 48.

---

[2] This conference call appears to have occurred on March 26, 2015, in the United States and March 27, 2015, in China.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

"O"

**CIVIL MINUTES - GENERAL**

| Case No. | CV15-07952-CAS (RAOx) | Date | January 9, 2017 |
|---|---|---|---|
| Title | *GUANGYI XU v. CHINACACHE INTERNATIONAL HOLDINGS LTD., ET AL.* | | |

(4) An concluded with earnings estimates based on the "continued migration" of customers onto the new system and by saying that "as the migration is completed" the company expected "normal revenue growth throughout the remainder of the year." <u>Id.</u> ¶ 49.

Plaintiff alleges that the aforementioned statements on March 26, 2015, were false and misleading. <u>Id.</u> ¶ 71. Plaintiff alleges these statements were knowingly false based on information received from former employees. For example, a former vice manager in charge of intrabusiness operational affairs ("FE8") claims that the HPCC system encountered technical problems in the first quarter of 2015, requiring the company to continue to operate both the old platform and the HPCC simultaneously. <u>Id.</u> ¶ 58. Plaintiff alleges, based on information from a ChinaCache system architect at the time ("FE4"), that approximately 70% of ChinaCache's technical personnel resigned in late 2014 and early 2015, negatively impacting the HPCC migration occurring during the period. <u>Id.</u> ¶ 56.

According to plaintiff, as of March 26, 2015, "dozens" of ChinaCache's smaller, "Tier 2," clients were not experiencing enhanced services as a result of the HPCC.[3] <u>Id.</u> Instead, at or around the time of the March press release and conference call, "many" of the company's Tier 2 customers were experiencing instability in their service and other technical problems resulting from the fraught transition to the HPCC. <u>Id.</u> The company allegedly decided to "abandon" certain Tier 2 customers facing technical problems and "to shepherd them to other providers." <u>Id.</u> Plaintiff alleges that ChinaCache's failure to disclose the HPCC's instability problems and the loss of several Tier 2 customers rendered false and misleading ChinaCache's claims regarding the functionality of the HPCC system on March 26, 2015.

---

[3] Plaintiff alleges that at some point in 2015, ChinaCache decided to designate certain customers "Tier 1" and other customers "Tier 2," based upon their relative sizes, needs, and purchases. SAC ¶ 9. For example, Apple, Inc. and Microsoft were considered Tier 1 customers because they accounted for a disproportionate amount of the company's revenues. <u>Id.</u> ¶ 61. According to plaintiff, a former employee has explained that Tier 2 customers constituted 70% of the company's customers numerically. <u>Id.</u> However, plaintiff does not allege what amount of data managed by ChinaCache derived from Tier 2 customers as opposed to Tier 1 customers.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

"O"

**CIVIL MINUTES - GENERAL**

| Case No. | CV15-07952-CAS (RAOx) | Date | January 9, 2017 |
|---|---|---|---|
| Title | *GUANGYI XU v. CHINACACHE INTERNATIONAL HOLDINGS LTD., ET AL.* | | |

On March 27, 2015, the price of ChinaCache shares traded on the NASDAQ rose from $8.72 to close at $10.30.  Id. ¶ 53.  The first quarter ended four days later on March 31, 2015.  Plaintiff alleges he acquired ChinaCache securities at artificially inflated prices after ChinaCache's false statements and omissions on March 26, 2015.  Id. ¶ 19.

### B.    Allegedly False and Misleading Statements on April 10, 2015

Plaintiff alleges that, on April 10, 2015, the company also made false and misleading statements in its 2014 Form 20-F.  In the 2014 Form 20-F, ChinaCache stated:

> In early 2015, we officially launched our next generation cloud-based [Content Delivery Network ("CDN")] platform, HPCC.  HPCC offers our customers enhanced stability and utilization through a unified distribution platform . . . The HPCC is expected to result in better traffic load balance, higher bandwidth reuse rates, lower maintenance costs, and greater efficiency through automated dispatching that maximized bandwidth utilization . . . as compared with traditional CDN architectures.

Id. ¶ 75.  The 2014 Form 20-F further stated:

> we launched and plan to continue the development of our Super-node Project, High Performance Cloud Cache, or HPCC [. . . .] We expect these projects, upon completion, to result in substantial reduction in our future operation expenses and capital expenditures on equipment but because the aforementioned technologies are relatively new, we cannot assure you that their implementation will benefit us with the cost and expense reduction as expected, or at all.

Id. ¶ 76.

Plaintiff alleges that the foregoing statements were false and misleading.  Id. ¶ 77.  According to plaintiff, "at least dozens" of Tier 2 clients were not experiencing "enhanced stability" or other technical benefits from the HPCC as claimed in the 2014

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

"O"

**CIVIL MINUTES – GENERAL**

| Case No. | CV15-07952-CAS (RAOx) | Date | January 9, 2017 |
|---|---|---|---|
| Title | *GUANGYI XU v. CHINACACHE INTERNATIONAL HOLDINGS LTD., ET AL.* | | |

Form 20-F. Id. Instead, many of the Tier 2 customers had been "abandoned" and switched their service provider to a ChinaCache competitor. Id.

### C. Allegedly False and Misleading Statements on May 18, 2015

On May 18, 2015, ChinaCache issued a press release ("May press release") announcing its first quarter earnings and guidance for the second quarter of 2015. Id. ¶ 78. Wang stated that as "we completed the migration to our [HPCC] and continue to invest to improve our infrastructure capabilities, we are experiencing enhanced customer satisfaction and increased new customer engagements." Id. The press release forecasted a 7.8% to 10.8% increase in net revenues during the second quarter as compared to the first. Id. ¶ 79.

The company also held an earnings conference call on May 18, 2015 that accompanied its press release ("May conference call"). Id. ¶ 80. During the call, defendants made the following statements:

(1) Wang stated that the HPCC had been "completed on schedule" and "[d]uring the first quarter, the platform demonstrated a significant improvement in efficiency, leading the industry on all performance indicators." Id.

(2) Zhang spoke during the call as well, referencing the "successful migration" to the HPCC platform and that "we can provide our clients with a more efficient and a stable network. By end of Q1 over 90% of traffic is supported by HPCC platform now." Id. ¶ 81.

(3) Defendant An added that the "completion of our customer migration onto the [HPCC] was better than we expected." Id.

Plaintiff alleges that the foregoing statements on May 18, 2015 were false and misleading. Id. ¶ 82. According to plaintiff, "at least dozens" of Tier 2 clients were not experiencing "enhanced customer satisfaction," a "significant improvement in efficiency," or a "more efficient and stable network." Id. Rather, they were experiencing an unstable network and many changed their service to a ChinaCache competitor. Id. A

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

"O"

**CIVIL MINUTES - GENERAL**

| Case No. | CV15-07952-CAS (RAOx) | Date | January 9, 2017 |
|---|---|---|---|
| Title | *GUANGYI XU v. CHINACACHE INTERNATIONAL HOLDINGS LTD., ET AL.* | | |

former senior sales manager at the time ("FE5") claims that ChinaCache's customers were dissatisfied with the company's performance.[4] Id. ¶ 63. Similarly, FE8 claims that the company received customer complaints regarding the transition in the first quarter of 2015 and attempted to react quickly to those complaints. Id. ¶ 64.

### D. ChinaCache Discloses Platform Issues in August 2015

On August 20, 2015 the company announced disappointing second quarter earnings. Id. ¶ 83. Wang noted that the company was "currently experiencing some platform issues, which have impacted our top-line recently." Id. During the earnings conference call that day Zhang stated, "the coexistence of old platform and HPCC creates operation and service issue, specifically the greatest challenge was to have two platforms running simultaneously to ensure sufficient bandwidth resources for our customers." Id. ¶ 84. Zhang added that the HPCC was "a new technology going through a breaking-in period and we are making constant improvement. Our team is also becoming more familiar with HPCC platform and is accumulating the experience required to once again have ChinaCache set the industry standard." Id.

Upon disclosure of the network issues and lower than expected revenue, shares on the NASDAQ declined in value from $8.51 to $5.59 on August 21, 2015.

## III. LEGAL STANDARDS

A Rule 12(b)(6) motion tests the legal sufficiency of the claims asserted in a complaint. "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Bell Atl. Corp. v. Twombly, 127 S. Ct. 1955, 1964-65 (2007). "[F]actual allegations must be enough to raise a right to relief above the speculative level." Id. at 1965.

A federal securities fraud suit is also subject to the demanding pleading requirements of the Private Securities Litigation Reform Act ("PSLRA"). Enacted by

---

[4] The SAC does not allege when the dissatisfaction noted by FE5 occurred.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

"O"

## CIVIL MINUTES - GENERAL

| Case No. | CV15-07952-CAS (RAOx) | Date | January 9, 2017 |
|---|---|---|---|
| Title | *GUANGYI XU v. CHINACACHE INTERNATIONAL HOLDINGS LTD., ET AL.* | | |

Congress in 1995 to provide "protections to discourage frivolous [securities] litigation," H.R. Conf. Rep. No. 104-369, 104th Cong., 1st Sess. at 32 (Nov. 28, 1995), the PSLRA strengthened the already-heightened pleading requirements of Federal Rule of Civil Procedure 9(b). Under the PSLRA, private actions based on allegations of material misstatements or omissions must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). In addition, the PSLRA imposes strict requirements for pleading scienter in actions brought pursuant to Section 10(b) and Rule 10b-5, requiring that the complaint "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2).

The Ninth Circuit has held that "a private securities plaintiff proceeding under the [PSLRA] must plead, in great detail, facts that constitute strong circumstantial evidence of deliberately reckless or conscious misconduct." In re Silicon Graphics, Inc., 183 F.3d 970, 974 (9th Cir. 1999). In determining whether a plaintiff has sufficiently pleaded scienter, a court must consider "whether the totality of plaintiffs' allegations, even though individually lacking, are sufficient to create a strong inference that defendants acted with deliberate or conscious recklessness." Nursing Home Pension Fund, Local 144 v. Oracle Corp., 380 F.3d 1226, 1230 (9th Cir. 2004) (quoting No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. W. Holding Corp., 320 F.3d 920, 938 (9th Cir. 2003)). Moreover, "[i]n determining whether a strong inference of scienter exists, [a court] must consider all reasonable inferences, whether or not favorable to the plaintiff." Id.

Certain statements are not actionable under the PSLRA because they fall within its safe-harbor provision. Specifically, the Safe Harbor Provision, 15 U.S.C. § 78u-5(c), provides that defendants shall "not be liable with respect to any forward-looking statement, whether written or oral, if and to the extent that" the statement is identified as forward-looking and accompanied by meaningful cautionary statements. Forward looking statements include statements of "the plans and objectives of management for future operations, including plans or objectives relating to the products or services of the issuer." 15 U.S.C. § 78u-5(i)(1)(B).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

"O"

**CIVIL MINUTES - GENERAL**

| Case No. | CV15-07952-CAS (RAOx) | Date | January 9, 2017 |
|---|---|---|---|
| Title | *GUANGYI XU v. CHINACACHE INTERNATIONAL HOLDINGS LTD., ET AL.* | | |

## IV.   DISCUSSION

The basic elements of a Rule 10b-5 claim are (1) a material misrepresentation or omission; (2) scienter; (3) a connection with the purchase or sale of a security; (4) reliance or "transaction causation"; (5) economic loss; and (6) loss causation or a causal connection between the material misrepresentation and the loss.  Dura Pharms., Inc. v. Broudo, 544 U.S. 336, 341-42 (2005).

ChinaCache argues that plaintiff has failed to allege an actionable misrepresentation, let alone a misrepresentation made with the requisite scienter.  The Court agrees.

The SAC claims that numerous public statements on March 26, April 10, and May 15, 2015, outlined above, were false or misleading to investors.  For simplicity, the Court will group statements into three categories, namely, (1) statements regarding progress migrating customer traffic and data onto the HPCC, (2) statements regarding the functionality of the HPCC, and (3) statements about customer satisfaction with the company's services.

### A.   Alleged Misrepresentations

### I.   The HPCC Migration

Plaintiff alleges that statements from both March and May were knowingly or recklessly false and misleading insofar as they represented to the market that the HPCC system migration was near completion in March or completed by May.  ChinaCache contends that plaintiff has not adequately alleged the falsity of any statement regarding the status of the HPCC migration.

Plaintiff must allege falsity in light of "specific 'contemporaneous statements or conditions' that demonstrate the intentional or the deliberately reckless false or misleading nature of the statements when made."  Ronconi v. Larkin, 253 F.3d 423, 432 (9th Cir. 2001).  A court evaluates defendants' alleged false statements in the context in which they were made, especially in regard to contemporaneous qualifying or clarifying language.  In re Syntex Corp. Sec. Litig., 95 F.3d 922, 929 (9th Cir. 1996) (holding

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

"O"

### CIVIL MINUTES - GENERAL

| Case No. | CV15-07952-CAS (RAOx) | Date | January 9, 2017 |
|---|---|---|---|
| Title | *GUANGYI XU v. CHINACACHE INTERNATIONAL HOLDINGS LTD., ET AL.* | | |

statements non-actionable where the "statement in full and in context at the time" acknowledged uncertainty). The industry in which ChinaCache operates adds relevant context insofar as the computer industry, "involves the situation where shareholders invest in an industry that is laden with risk." Id. at 933. Critically, plaintiff must "demonstrate that a particular statement, *when read in light of all the information then available* to the market . . . conveyed a false or misleading impression." In re Convergent Techs. Sec. Litig., 948 F.2d 507, 512 (9th Cir. 1991), as amended on denial of reh'g (Dec. 6, 1991) (emphasis added). Where contemporaneous statements contradict or qualify the alleged false statements, plaintiff must allege why they remain misleading despite that context. See e.g., Padnes v. Scios Nova Inc., 1996 WL 539711, at *9 (N.D. Cal. Sept. 18, 1996) (granting a motion to dismiss where publicly available information contradicted the alleged false public statement when it was made).

Plaintiff alleges that several statements regarding the status of the company's migration on the new HPCC platform were false or misleading. The Court begins by evaluating those made in March 2015.

In the March press release, ChinaCache stated that it was "on track in completing the migration [to the HPCC] in the first quarter of 2015." SAC ¶ 7. Additionally, during the March conference call, Zhang stated, that "HPCC will be the foundation for ChinaCache's future business growth. Our HPCC deployment project is ongoing, is expected to be fully functional by end of first quarter of this year." Dkt. 33 Ex. 4 at 9 ("March Call Transcript"). An stated during the March conference call that "[a]s this migration will continue into the first quarter of 2015, we currently expect the first quarter of 2015 revenue to be slightly above the first quarter of 2014. However, once we completed the migration, we expect [sic] the revenue growth momentum to return." March Call Transcript at 12.

Plaintiff contends that the foregoing statements falsely led the market to believe that the migration onto the HPCC would be 100% complete by March 31, 2015, the last day of the first quarter of 2015, when, in reality, ChinaCache was "far from" completing the migration onto the HPCC. SAC ¶¶ 7-8.

As an initial matter, the foregoing statements by ChinaCache were forward-looking. "The PSLRA imposes additional burdens [upon] allegations involving

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

"O"

**CIVIL MINUTES - GENERAL**

| Case No. | CV15-07952-CAS (RAOx) | Date | January 9, 2017 |
|---|---|---|---|
| Title | *GUANGYI XU v. CHINACACHE INTERNATIONAL HOLDINGS LTD., ET AL.* | | |

predictions." Institutional Inv'rs Grp. v. Avaya, Inc., 564 F.3d 242, 254 (3d Cir. 2009). The PSLRA's safe harbor provision exempts statements regarding "plans and objectives of management for future operations" if they are identified as forward-looking and accompanied by meaningful cautionary language or if plaintiffs do not allege facts creating a strong inference of scienter. Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc., 759 F.3d 1051, 1058 (9th Cir. 2014). Plaintiff does not contest that ChinaCache's statements were accompanied by cautionary language, but instead argues that warnings regarding hypothetical risks are inadequate where the risks have already come to fruition. Opp'n at 12 (citing Flynn v. Sientra, Inc., No. CV1507548SJORAOX, 2016 WL 3360676, at \*11 (C.D. Cal. June 9, 2016)).

Plaintiff appears to contend that the safe harbor provision of the PSLRA cannot protect misleading statements if defendants knew their falsity at the time. However, the Flynn court did not purport to base its ruling on an interpretation of the PSLRA's safe harbor provisions. In Flynn, the court evaluated whether or not a defendant's cautionary warnings *themselves* constituted false or misleading statements. Id. at \*10 ("'Risk Factors' identified in the SEC filings . . . constitute all but three of the challenged statements"). Plaintiff does not allege that ChinaCache's cautionary language was itself false or misleading. Nor do allegations of scienter preclude application of the PSLRA's safe harbor provision to forward-looking statements. See In re Cutera Sec. Litig., 610 F.3d 1103, 1112 (9th Cir. 2010) (rejecting the proposition that a "sufficiently strong inference of actual knowledge would overcome a claim of safe harbor protection even for statements identified as forward-looking and accompanied by meaningful cautionary language . . . [because it is] not only inconsistent with the statutory language, but has been rejected by all of our sister circuits"). Accordingly, to the extent plaintiff alleges that ChinaCache incorrectly predicted that the migration would be complete approximately one week after the foregoing statements, ChinaCache's statements appear to be protected by the PSLRA's Safe Harbor Provisions. See Avaya, 564 F.3d at 255 (determining the phrase "on track" was still covered by the PSLRA safe harbor for forward-looking statements where it could not "meaningfully be distinguished from the future projection of which [it was] a part").

However, assuming arguendo that ChinaCache's statements on March 26 are not protected by the safe harbor provisions of the PSLRA, plaintiff has not alleged the falsity of the foregoing statements. Plaintiff alleges that the migration of traffic onto the HPCC

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

"O"

**CIVIL MINUTES - GENERAL**

| Case No. | CV15-07952-CAS (RAOx) | Date | January 9, 2017 |
|----------|----------------------|------|-----------------|
| Title | *GUANGYI XU v. CHINACACHE INTERNATIONAL HOLDINGS LTD., ET AL.* | | |

could not be completed by the end of the first quarter; however, ChinaCache does not appear to have claimed that it could or would be. The phrase "on track in completing the migration," expressly contemplates an ongoing effort rather than past completion. Plaintiff does not allege a timeline against which the "on track" claim might be verified. Accordingly, plaintiff does not allege that the migration to the HPCC was off-track as of March 26. Additionally, during the March conference call, ChinaCache executives repeatedly acknowledged that the migration was incomplete and ongoing. Zhang stated, "I think as our platform HPCC will be fully functional in Q1 and *most of our service will be tapped over during Q1 and Q2 . . .* we can expect higher growth in Q2 and Q3." March Call Transcript at 14 (emphasis added). Similarly, Wang stated, "[t]he migration is expected to complete *by the third quarter of 2015.*" Id. at 3 (emphasis added). In light of this context, plaintiff has failed to allege that, on March 26, 2015, ChinaCache stated that traffic was on-track to be 100% migrated onto the HPCC by March 31, 2015. Instead, ChinaCache stated that although the HPCC was fully functional, the transition onto the HPCC was expected to continue throughout the second quarter of 2015. Plaintiff has not alleged that said statements were false.

Plaintiff also alleges that ChinaCache misled investors in May by misrepresenting the status of the migration to the HPCC at that time. Specifically, plaintiff alleges that ChinaCache led investors to believe that the transition onto the HPCC was completed during the first quarter. However, as explained in detail in the Court's prior order, plaintiff does not allege that any statement ChinaCache made in May was false.

In the May press release, ChinaCache stated, "as we completed the migration to our [HPCC] Platform . . . we are experiencing enhanced customer satisfaction." Dkt. 33 Ex. 5 at 1 ("May Release"). In the May conference call, Wang stated that HPCC "platform migration has been completed on schedule." Dkt. 33 Ex. 6 at 3 ("May Call Transcript"). Similarly, An stated that "completion of our customer migration onto the High Performance Cloud Cache platform was better than we expected." Id. at 6.

However, during the same conference call, Zhang stated:

We are pleased to see a successful *ongoing transition* to our cloud-based HPCC. . . . During the first quarter, we *made further progress* on the HPCC

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

"O"

**CIVIL MINUTES - GENERAL**

| Case No. | CV15-07952-CAS (RAOx) | Date | January 9, 2017 |
|---|---|---|---|
| Title | *GUANGYI XU v. CHINACACHE INTERNATIONAL HOLDINGS LTD., ET AL.* | | |

> migration work . . . . By end of Q1, *over 90% of traffic is supported by HPCC platform now*.

Id. at 4 (emphasis added).  Additionally, An stated, "[w]e still have work to do and need a little bit more time to continue all of our optimization efforts for these major initiatives." Id. at 6.  An continued:

> We put a lot of effort in Q1 to launch our - to finish our HPCC migration and in Q2 we just launched the BSP platform, so that *should take us a little bit time* [sic] *to ramp up everything and run the platform very smoothly and to fulfill the service*. . . . I'm pleased with our performance in the first quarter despite the *ongoing platform migration interruption* we experienced in the first quarter of 2015.

Id. at 7 (emphasis added).  These statements, also made on May 18, contradict the notion that migration had already been 100% completed.  On May 18, defendants said the HPCC migration was "completed," "ongoing," making "progress," "needed a little bit more time," "ramp[ing] up," "launched," "finish[ed]," "on schedule," and supporting "over 90% of traffic."  The particular phrases on which plaintiff relies must be read in light of all the information available on that day, including defendant's contemporaneous statements acknowledging that the transition was ongoing.  See e.g., In re Syntex Corp. Sec. Litig., 95 F.3d at 929.  Read in context, plaintiff has failed to allege that ChinaCache's claims about an ongoing transition to the HPCC were false at the time they were made.

Plaintiff alleges that "Tier 2" customers constituting between 10% and 20% of ChinaCache's traffic were experiencing technical problems because of the co-existence of ChinaCache's prior, non-HPCC, platform.  SAC ¶ 62.  This does not appear to be inconsistent with Zhang's statement that 90% of customer traffic was supported by the HPCC as of May 18, 2015.  May Call Transcript at 4.  In fact, the statement plaintiff alleges first revealed the incomplete migration to the public in August 2015, was analogous to statements ChinaCache made in the May 18 conference call.  Compare SAC ¶ 53 (on August 21, 2015, Wang stated "we continue to focus on migration during the second quarter.  As of today, 90% of our pages have migrated to HPCC with improved

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

"O"

### CIVIL MINUTES - GENERAL

| Case No. | CV15-07952-CAS (RAOx) | Date | January 9, 2017 |
|---|---|---|---|
| Title | *GUANGYI XU v. CHINACACHE INTERNATIONAL HOLDINGS LTD., ET AL.* | | |

stability") with May Call Transcript at 4 (on May 18, 2015, Zhang stated, "[b]y end of Q1, over 90% of traffic is supported by HPCC platform now").

In light of the foregoing, plaintiff has not alleged that ChinaCache made a false or misleading statement regarding the incomplete HPCC migration between March 2015 and August 2015.

### II.     HPCC Functionality

Plaintiff next argues that several statements regarding the functionality of the HPCC were false and misleading.

Statements are not actionable if they are "generalized, vague and unspecific assertions, constituting mere 'puffery' upon which a reasonable consumer could not rely." Glen Holly Entm't, Inc. v. Tektronix, Inc., 352 F.3d 367, 379 (9th Cir. 2003) (citing Cook, Perkiss & Liehe, Inc. v. N. California Collection Serv. Inc., 911 F.2d 242 (9th Cir. 1990)). The Ninth Circuit has found the phrases "best technology, lower rates, and better customer service," to be non-actionable corporate puffery. Cook, Perkiss & Liehe, Inc., 911 F.2d at 246. In contrast, "[s]tatements by a company that are capable of objective verification are not 'puffery' and can constitute material misrepresentations." Oregon Pub. Employees Ret. Fund v. Apollo Grp. Inc., 774 F.3d 598, 606 (9th Cir. 2014).

Even if statements are not puffery, plaintiff must still plead that they were false when made with some specificity. General pleadings that allege "significant" or "difficult" problems and "inefficiencies" confronting a company must allege that those obstacles existed at the time defendants' statements were made and specifically how they show defendants' statements to be false at the time. Ronconi, 253 F.3d at 432. Otherwise, a court "cannot discern what statements the complaint says were false or misleading nor the basis for concluding they were made intentionally or with deliberate recklessness." Id. The existence of "kinks" does not make positive statements about software false. "If that were the case, the federal securities laws would prevent software companies from making any positive statements about new software." In re Siebel Sys., Inc. Sec. Litig., 2005 WL 3555718, at *4 (N.D. Cal. Dec. 28, 2005) (Breyer, J.); see also, In re Autodesk, Inc. Sec. Litig., 132 F. Supp. 2d 833, 840 (N.D. Cal. 2000) (finding no

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

"O"

**CIVIL MINUTES - GENERAL**

| Case No. | CV15-07952-CAS (RAOx) | Date | January 9, 2017 |
|---|---|---|---|
| Title | *GUANGYI XU v. CHINACACHE INTERNATIONAL HOLDINGS LTD., ET AL.* | | |

allegations "regarding the specific nature of the bugs or the technical difficulties, or their impact on product development").

Plaintiff alleges that several statements by ChinaCache were false or misleading with regard to the functionality of the HPCC platform. The Court addresses each in-turn.

First, plaintiff alleges that a statement in the March press release was false or misleading insofar as ChinaCache claimed:

> Our fourth quarter revenue was impacted by our decision to accelerate customer migration onto our next-generation [HPCC] platform, which resulted in less available bandwidth and service capacity. However, as we are on track in completing the migration in the first quarter of 2015, *we can now offer enhanced services and a more efficient network to all our customers*, which will strengthen our long-term competitive position and our ability to address a rapidly growing market. Going forward, with our industry-leading infrastructure, customers will experience faster, more reliable service, and we will benefit from higher bandwidth reuse, and greater capacity through a more balanced network system.

Dkt. 33 Ex. 3 at 1 ("March Press Release") (emphasis added).[5] However, claims to "enhanced service" or being "more efficient" are too vague to be more than non-

---

[5] As already discussed, much of the foregoing statement is forward-looking and appears to be protected by the PSLRA's safe harbor provisions. Plaintiff focuses much of his argument upon the emphasized portion. Although said portion contains the words "can now offer," its surrounding context is that of a forward-looking statement. For instance, the press release provides that "enhanced services," "will strengthen" the company's "long-term" market position. It also stated that "[g]oing forward," customers "will experience" better services and the company "will benefit." As with the phrase "on track in completing the migration," contained in the press release and discussed in detail already, the Court concludes that portion regarding functionality and "enhanced services" is forward-looking and subject to the protection of the PSLRA's safe harbor provisions. However, as the proceeding discussion makes clear, ChinaCache's expectation of offering "enhanced services," was also non-actionable puffery.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

"O"

**CIVIL MINUTES - GENERAL**

| Case No. | CV15-07952-CAS (RAOx) | Date | January 9, 2017 |
|----------|------------------------|------|-----------------|
| Title | *GUANGYI XU v. CHINACACHE INTERNATIONAL HOLDINGS LTD., ET AL.* | | |

actionable puffery. It is unclear, and plaintiff does not allege, what "enhanced" and "more efficient" are understood to mean in the industry. Accordingly, they are too vague to be actionable. See In re Boston Tech., Inc. Sec. Litig., 8 F. Supp. 2d 43, 67 (D. Mass. 1998) (statement purporting to offer "enhanced services" is "precisely the sort of statement that is routinely dismissed as immaterially loose corporate optimism"); Lloyd v. CVB Fin. Corp., 811 F.3d 1200 (9th Cir. 2016) (holding the phrase "overall quality . . . is sound" and the assertion that a company's credit metrics "'are superior' to those of its peers" were puffery); In re Cutera Sec. Litig., 610 F.3d 1103, 1111 (9th Cir. 2010) ("[a] mildly optimistic, subjective assessment hardly amounts to a securities violation"); Cook, Perkiss & Liehe, Inc., 911 F.2d at 246 ("best technology, lower rates, and better customer service"); Wozniak v. Align Tech., Inc., 850 F. Supp. 2d 1029, 1036 (N.D. Cal. 2012) (statement regarding "improved features" is non-actionable puffery); In re Wet Seal, Inc. Sec. Litig., 518 F. Supp. 2d 1148, 1168 (C.D. Cal. 2007) (claim to "significant improvement" is non-actionable puffery).

Plaintiff also alleges that several statements in the March conference call were false or misleading. Specifically, plaintiff challenges the following statement:

[the HPCC] is a major upgrade of our CDN platform . . . which can provide the network service with higher scalability, flexibility and stability . . . . From our ongoing test, our network performance has improved by more than 60% compared to the previous platform, and is significantly better than the competition.

March Call Transcript at 9. As with statements in the March press release, ChinaCache's claim that the HPCC could provide "higher scalability, flexibility and stability" are non-actionable puffery. ChinaCache's claim that the HPCC improved "network performance" by "more than 60% compared to the previous platform" is not puffery because it purported to represent the findings of "ongoing tests," which presumably could be verified. However, plaintiff has failed to plead facts showing the foregoing statement was false. None of plaintiff's allegations purport that the HPCC was performing *worse* than the prior network or anything other than 60% better. Instead, plaintiff merely alleges that the HPCC migration was incomplete and that an undetermined number of customers were facing undetermined technical issues. Allegations regarding undetermined technical problems are too vague to show the falsity of ChinaCache's claim

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

"O"

**CIVIL MINUTES - GENERAL**

| Case No. | CV15-07952-CAS (RAOx) | Date | January 9, 2017 |
| --- | --- | --- | --- |
| Title | *GUANGYI XU v. CHINACACHE INTERNATIONAL HOLDINGS LTD., ET AL.* | | |

that the HPCC was an improvement over its predecessor.  See Ronconi, 253 F.3d at 429 (allegations of "significant" or "difficult" problems are insufficient).

Next, plaintiff challenges a statement made in the 2014 Form 20-F:

we launched and plan to continue the development of our Super-node Project, [HPCC], and Bandwidth Schedule Platform to optimize bandwidth usage and improve network efficiency.  We expect these projects, upon completion, to result in substantial reduction in our future operation expenses and capital expenditures on equipment but because the aforementioned technologies are relatively new, we cannot assure you that their implementation will benefit us with the cost and expense reduction as expected, or at all.

2014 Form 20-F at 7.  However, the foregoing statement appears to be nonactionable for a number of reasons.  First, it is protected by the safe harbor provisions of the PSLRA because it merely describes what ChinaCache "expect[ed]" at the time.  Additionally, it does not describe any feature of the HPCC, which has been challenged by plaintiff here.  Instead, the 2014 Form 20-F statement shows general optimism about a group of initiatives, including the HPCC.  Accordingly, it is both puffery and plaintiff has not alleged its falsity.

Finally, plaintiff alleges that several statements in the May conference call were false or misleading.  Plaintiff alleges that it was false or misleading for Wang to state, "[d]uring the first quarter, the [HPCC] platform demonstrated a significant improvement in efficiency, leading the industry on all performance indicators."  May Call Transcript at 3.  However, general claims to "improved efficiency" are nonactionable puffery.  Furthermore, plaintiff does not allege that the HPCC decreased efficiency relative to ChinaCache's prior CDN.

Plaintiff further alleges that Zhang made a false or misleading statement by claiming:

[w]ith the deployment of more flexible and redundant super node and the successful migration of services to our cloud-based HPCC platform, and the

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

"O"

**CIVIL MINUTES - GENERAL**

| Case No. | CV15-07952-CAS (RAOx) | Date | January 9, 2017 |
|----------|----------------------|------|-----------------|
| Title | *GUANGYI XU v. CHINACACHE INTERNATIONAL HOLDINGS LTD., ET AL.* | | |

launch of bandwidth scheduling platform, which optimizes bandwidth usage and balances traffic throughout the entire CDN network, we can provide to our clients with a more efficient and a stable network."

May Call Transcript at 4.  However, ChinaCache's claim that the transition was "successful" is nonactionable puffery.  Additionally, plaintiff has failed to allege that ChinaCache could not "provide clients with a more efficient and stable network." Although plaintiff alleges that "dozens" of "Tier 2" clients experienced problems with the HPCC, the existence of undetermined problems for an undetermined amount of data on ChinaCache's platform does not demonstrate that ChinaCache's general statement of optimism about the software was false.  See In re Siebel Sys., Inc. Sec. Litig., 2005 WL 3555718 at *4 (N.D. Cal. Dec. 28, 2005) (Breyer, J.); In re Autodesk, Inc. Sec. Litig., 132 F. Supp. 2d at 840 (N.D. Cal. 2000).  Finally, although plaintiff's allegations focus solely upon problems with the implementation of the HPCC, Zhang's statement during the May conference call describes the general positive effects of a "redundant super node" as well as a new "bandwidth scheduling platform" combined with the HPCC platform.  Plaintiff does not allege that these combined efforts could not provide a more efficient and stable network than their predecessors.

In light of the foregoing, plaintiff has not alleged that ChinaCache made a false statement with regard to the functionality of the HPCC.

### III.   Customer Satisfaction

Lastly, plaintiff alleges that ChinaCache's May press release was false when it claimed, "we are experiencing enhanced customer satisfaction and increased new customer engagements."  May Release at 1.  Plaintiff alleges that the foregoing statement was false because, according to FE5, "customers were dissatisfied with the Company's performance, migrating to the HPCC platform."  SAC ¶ 63.  According to plaintiff, "dozens" of "Tier 2" customers ceased using HPCC services because of technical problems created by the transition to the HPCC, which the company lacked adequate technical personnel to address in a timely fashion.  Id. ¶ 9.  According to FE12, a human resource business partner and "operational department director," id. n. 11, "during the first quarter of 2015, ChinaCache began to lose a material number of customers" and, ultimately, "lost about 10% of its clients due to technical problems associated with HPCC

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

"O"

**CIVIL MINUTES - GENERAL**

| Case No. | CV15-07952-CAS (RAOx) | Date | January 9, 2017 |
|----------|----------------------|------|-----------------|
| Title | *GUANGYI XU v. CHINACACHE INTERNATIONAL HOLDINGS LTD., ET AL.* | | |

platform migration," id. ¶ 59.  Plaintiff further alleges that instead of addressing Tier 2 customers' concerns, the company elected to focus technical staff on maintaining the HPCC platform at full functionality for Tier 1 customers, which "accounted for a disproportionate amount of the Company's revenues."  Id. ¶ 61.

The alleged false statement occurred in ChinaCache's May press release.  In the press release, Wang said:

> [a]s we completed the migration to our High Performance Cloud Cache Platform and continue to invest to improve our infrastructure capabilities, we are experiencing enhanced customer satisfaction and increased new customer engagements, including CreditEase and Taikang Life.  Customers are pleased with the introduction of our MPlus mobile intelligence aware solution, and our SMS (Smart Media Server) live streaming platform.

May Release at 1.

Plaintiff relies upon a single decision for his contention that "enhanced customer satisfaction" is an actionable statement.  Opp'n at 13 (relying exclusively upon In re Nash Finch Co., 502 F. Supp. 2d 861 (D. Minn. 2007)).  However, Nash Finch is not persuasive authority in the instant case.

In Nash Finch, the defendant, the owner of a food label, was asked directly, during an earnings call, about whether the company would be able to retain the customers of two food distributors it had purchased.  The defendant answered:

> the 2 areas that I focused personally on were customer retention and private label integration . . . . And I'm happy to report to you that I'm very pleased, very pleased with the results of both.
>
> As you can imagine, the moment we announced the acquisition, every wholesaler in the Midwest began to call on these customers. The result of all of that activity, Gary, is we lost one $15,000 a week retailer.  One $15,000 a week retailer. Now, I think that is a fabulous result.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

"O"

**CIVIL MINUTES - GENERAL**

| Case No. | CV15-07952-CAS (RAOx) | Date | January 9, 2017 |
|---|---|---|---|
| Title | *GUANGYI XU v. CHINACACHE INTERNATIONAL HOLDINGS LTD., ET AL.* | | |

> As it relates to our private label integration, it's gone very, very well. The quality of the Our Family brand I think is selling itself, not only to our retailers but to their customers.

Nash Finch, 502 F. Supp. 2d at 868.  Ultimately, the defendant did not argue that the foregoing statements were puffery.  The Nash Finch court acknowledged that although some statements made by defendants were puffery, "'puffing' statements are not the crux of Plaintiff's allegations."  Id. at 878.  The company claimed to have lost a single "$15,000 a week retailer" during the acquisition of the new distribution centers, when, in truth, the company lost business from several major grocers including a single retailer accounting for $20 million in lost revenue that year and another with 19 store locations. Id. at 880.  Nonetheless, the Nash Finch court did not rest its decision upon plaintiff's allegations regarding customer retention and reasoned that numerous allegedly false statements, mostly unrelated to customer retention, combined to make the company's many statements about the distribution center acquisition sufficiently false to state a claim.  Id.

Wang's statement regarding "enhanced customer satisfaction," is easily distinguished from the lengthy, explicit, and detailed claims about customer satisfaction in Nash Finch.  For one, Wang's claim to "enhanced customer satisfaction" was vague.  It is unclear that "enhanced customer satisfaction" is inconsistent with the company also losing some of its customers.  The word "enhanced" implies a relative improvement. However, plaintiff acknowledges that the company disclosed annual customer attrition rates between 9.8% and 16.8% in the three years preceding 2015.  See 2014 Form 20-F. Plaintiff does not adequately allege that the loss of "dozens" of customers rendered any claim to "enhanced customer satisfaction" false.  Nor does plaintiff allege that the company was not experiencing "increased new customer engagements."

More importantly, and in contrast to the statements in Nash Finch, Wang did not tie "enhanced" satisfaction to the HPCC migration specifically, the only program plaintiff alleges was facing technical problems.  Instead Wang mentioned only two pleased customers and discussed customer satisfaction with other programs.  Elsewhere analogous comments have been deemed non-actionable puffery and "feel good" statements.  See Wozniak, 850 F. Supp. 2d at 1036 (concluding that the phrase "so far we're getting really great feedback" was non-actionable puffery); In re Wet Seal, 518 F. Supp. 2d at 1168 (claim to be "receiving positive feedback from our customers" is non-

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

"O"

**CIVIL MINUTES - GENERAL**

| Case No. | CV15-07952-CAS (RAOx) | Date | January 9, 2017 |
|---|---|---|---|
| Title | *GUANGYI XU v. CHINACACHE INTERNATIONAL HOLDINGS LTD., ET AL.* | | |

actionable puffery).  This Court similarly concludes that an unexplained claim to "enhanced customer satisfaction" is nonactionable puffery and that plaintiff has not adequately alleged its falsity.

In light of the foregoing, the Court concludes that plaintiff does not allege any actionable and false or misleading statements by ChinaCache.  Accordingly, plaintiff has failed to state a claim for securities fraud.

**B.    Scienter**

Both falsity and scienter are "generally strongly inferred from the same set of facts," which permits the court to incorporate the dual pleading requirements into a "single inquiry."  Ronconi, 253 F.3d 423, 429 (9th Cir. 2001).  Assuming arguendo that the statements were false and misleading, it is difficult to evaluate whether ChinaCache executives may have made the challenged statements with the requisite knowledge that they were false or misleading because plaintiff has not alleged any specific, actionable, false statement.  However, to preserve judicial economy in the event that plaintiff seeks to amend his pleadings, the Court notes that plaintiff does not appear to have made allegations creating a strong inference of scienter.

As an initial matter, plaintiff does not allege that any executive personally gained by purportedly misleading investors.  Plaintiff does not allege that any executive traded in ChinaCache stock such that their scienter might be inferred from a defendant's pecuniary gain.  Nor does plaintiff make "specific allegations" that one of the accused executives was exposed to information contradicting their public statements.  S. Ferry LP, No. 2 v. Killinger, 542 F.3d 776, 785 (9th Cir. 2008).

Although plaintiff alleges, based on statements by FE12, that "senior management" was involved in meetings regarding the decision to focus customer support on Tier 1 clients, SAC ¶ 59, such allegations do not establish that the individual defendants were present and/or knew their vague public statements about the HPCC to be false.  See Cho v. UCBH Holdings, Inc., 2011 WL 3809903, at *13 (N.D. Cal. May 17, 2011) ("allegations about senior management are insufficient to support an inference of scienter as to any individual Defendant").

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

"O"

**CIVIL MINUTES - GENERAL**

| Case No. | CV15-07952-CAS (RAOx) | Date | January 9, 2017 |
|---|---|---|---|
| Title | *GUANGYI XU v. CHINACACHE INTERNATIONAL HOLDINGS LTD., ET AL.* | | |

Nor does plaintiff allege facts supporting application of the core operations doctrine. Plaintiff has not alleged facts showing that problems with the HPCC were so "prominent" within a company that it would be "absurd to suggest" that the company's management was unaware of the issue. Berson v. Applied Signal Technology, Inc., 527 F.3d 982, 989 (9th Cir. 2008) (applying the core operations doctrine where it would be "'absurd to suggest' that top management" was unaware of stop-work orders that were having a "devastating effect" on the corporation's revenue).

During oral argument, plaintiff's counsel argued that the allegations give rise to corporate, collective scienter because plaintiff alleges that "senior management" were present for meetings regarding the loss of Tier 2 clients. The Ninth Circuit has "not previously adopted a theory of collective scienter," although the corporate scienter doctrine "might be appropriate in some cases . . . [f]or instance [where] . . . a company's public statements were so important and so dramatically false that they would create a strong inference that at least *some* corporate officials knew of the falsity upon publications." In re NVIDIA Corp. Sec. Litig., 768 F.3d 1046, 1063 (9th Cir. 2014). Thus far, cases addressing the *possibility* that a plaintiff might allege corporate, collective scienter have compared the necessary allegations to a hypothetical set of facts proposed by the Seventh Circuit in Makor Issues & Rights, Ltd. v. Tellabs Inc., 513 F.3d 702, 710 (7th Cir. 2008). See In re NVIDIA Corp. Sec. Litig., 768 F.3d 1046, 1063 (9th Cir. 2014) (comparing allegation to Makor hypothetical); Glazer Capital Mgmt., LP v. Magistri, 549 F.3d 736, 745 (9th Cir. 2008) ("we need not decide whether we agree [with the corporate scienter doctrine] because the facts of this case are different from the hypothetical in Makor). In Makor, the Seventh Circuit stated that corporate scienter might be alleged if a car manufacturer announced one million SUV sales in a year despite actually selling none at all. Makor, 768 F.3d at 710. Under those circumstances, the claim to one million nonexistent sales might be so important and so dramatically false that it could give rise to a strong inference of scienter for the corporation's executives. Id.

Plaintiff's allegations regarding the HPCC do not give rise to a strong inference of corporate scienter. The Court has already ruled that plaintiff does not allege any false, actionable statements by ChinaCache, let alone statements of such import and falsity that they create a strong inference of corporate scienter. As such, plaintiff does not allege that ChinaCache's statements rise to the level of importance and falsity that the Makor court surmised would satisfy the scienter pleading requirements.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

"O"

**CIVIL MINUTES - GENERAL**

| Case No. | CV15-07952-CAS (RAOx) | Date | January 9, 2017 |
|---|---|---|---|
| Title | *GUANGYI XU v. CHINACACHE INTERNATIONAL HOLDINGS LTD., ET AL.* | | |

Accordingly, although a thorough evaluation of scienter would require an assessment of particular false statements, not present here, it appears that any amended pleadings will likely require more detailed scienter allegations.

**V.     CONCLUSION**

ChinaCache's motion to dismiss is **GRANTED**.  The SAC is **DISMISSED without prejudice**.  If plaintiff chooses to amend, plaintiff shall file the Third Amended Complaint on or before January 30, 2017.

IT IS SO ORDERED.

|  | 00: | 23 |
|---|---|---|
| Initials of Preparer | | IV |